## STATE v. REGINA SCHABERT.[1]

No. 33,714.

June 23, 1944.

[1]Reported in 15 N. W. (2d) 585.

2

*Arthur E. Arntson* and *L. J. Kilbride,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, and *Vance B. Grannis,* Acting County Attorney, for the State.

LORING, CHIEF JUSTICE.

This is an appeal from an order denying the defendant's motion for a new trial. We have before us only defendant's testimony, certain exhibits, the county attorney's argument, and the court's charge certified by the court. We treat it as a bill of exceptions.

Regina Schabert was arrested in the early morning of March 5, 1942, and lodged in the county jail at Hastings, Minnesota. She was being held under suspicion of having killed her husband, Frank Schabert, who was found dead in their house with a gunshot wound in his side which had evidently penetrated to his heart. The circumstances leading up to his death, as related by defendant, may be briefly stated as follows: On the morning of March 4, 1942, Regina arose about five o'clock and prepared breakfast and a lunch for her husband to take with him to work. Shortly there-

after, Frank, who was employed at the Federal Cartridge Company plant at New Brighton, left for work, but returned in a few minutes after having had a controversy with the men who rode to work in the same car with him. He told his wife that he wanted five dollars "to go and get drunk." This she refused, and they then took their seven-year-old son to school, after which they returned home and she gave him two dollars. She did not see him again until about eight o'clock in the evening when he returned home. He refused to eat supper, though she had it prepared for him. After putting the boy to bed they both went downtown and visited some saloons, where Frank drank whiskey and Regina a few glasses of beer. Late in the evening they drove to Newport, Frank driving the car. He was at that time somewhat intoxicated and drove from side to side of the road. At Newport they entered a tavern and had more drinks. Regina obtained the keys to the car and on their return from Newport to Hastings refused to let Frank drive on account of his condition. Frank had frequently beaten her, and on their way to Hastings he engaged in beating her around the head and arms. He also insisted on pulling the hand throttle of the car so as to speed it up, and this finally resulted in the car hitting a guard post at the side of the road. On arriving at their home in Hastings, they went into the house, and Frank again started to beat her. She got away from him and took her sleeping boy out of bed and ran to a neighbor's house to call the police, who came and put Frank in their squad car. After he got in the car he evidently tried to persuade the police that he would behave himself if they would leave him at home. They asked her if they should let him stay. She said that "it was up to them." They left him. She and her husband then reëntered the house, she to rest on the bed, he to sit in a chair in the dark combination living and dining room. Not long thereafter, having turned on the lights, he began scolding her for having called the police and also for having collided with the guard post on the road home. He called her vile names and threatened to kill her. He picked up a chair with which to accomplish his purpose, but she succeeded in preventing his use

of the chair as a weapon, whereupon she asserts that he grabbed for the shotgun, which was standing in a corner of the room. She also grabbed for it, and in the struggle for the gun it was discharged, causing the wound from which Frank died. She asserts that she did not intend to kill him; that if it was she who discharged the gun it was done accidentally; and that, at worst, it was discharged in self-defense in her endeavor to prevent her husband from using the weapon upon her.

Regina had been found to be a feeble-minded person, and the record indicates that she had the mentality of a child of eight years and ten months. It seems that their child was born out of wedlock and that Frank married her a year or so after the child's birth.

After the wound had been inflicted upon Frank, Regina testified that she straightened him out on the floor, then took the car, and went to her mother's place and told her what had happened. Her mother advised her to return to town and give herself up to the police. This she did, and in response to her telephone call the police came to the house and took her to jail. This was in the early morning of March 5. She was not arraigned until the 7th. She testified that she asked to have her parents, her priest, her lawyer, and her doctor, but her requests were not complied with until she had given what is hereinafter referred to as her second confession, to the effect that she had deliberately shot her husband while he was lying on the bed. This confession was not obtained until March 6, after she had been extensively and repeatedly questioned in regard to the shooting. A previous confession had been obtained on the 5th, but it may be inferred that it was not satisfactory to the sheriff's office, because it was never offered in evidence. The prosecuting officers persisted until the second confession was obtained. It is challenged on the ground that it was not a voluntary confession, but was obtained by psychological pressure. There is no claim that she was tortured physically, except that she was kept awake by the persistent questioning and felt sick and extremely tired when she finally signed the document. In the state

of the record, the alleged error in admitting this confession becomes one of the principal problems presented on this appeal.

■ The Supreme Court of the United States has in a number of recent decisions discussed the admissibility of confessions obtained by prosecuting officers while the accused was under pressure of persistent questioning and was detained incommunicado. Lisenba v. California, 314 U. S. 219, 62 S. Ct. 280, 86 L. ed. 166; McNabb v. United States, 318 U. S. 332, 63 S. Ct. 608, 87 L. ed. 819; Ashcraft v. Tennessee, 322 U. S. 143, 64 S. Ct. 921; United States v. Mitchell, 322 U. S. 65, 64 S. Ct. 896; Lyons v. Oklahoma, 322 U. S. 596, 64 S. Ct. 1208. The federal courts do not receive evidence illegally obtained if timely motion is made for its suppression, but in reviewing the decisions of state courts where confessions are challenged as involuntary, the Supreme Court of the United States applies the due process clause of the Fourteenth Amendment. In Lisenba v. California, *supra,* the court speaking through Mr. Justice Roberts, said (314 U. S. 236, 62 S. Ct. 290, 86 L. ed. 180):

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial. Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt."

In Lyons v. Oklahoma, 322 U. S. 596, at pp. 605 and 602, respectively, 64 S. Ct. at pp. 1213 and 1212, *supra,* the Fourteenth Amendment was said to be—

"'* * * a protection against criminal trials in state courts conducted in such a manner as amounts to a disregard of 'that fundamental fairness essential to the very concept of justice,' and in a way that 'necessarily prevents a fair trial.' " The court also said: "The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he

confesses, is in possession of 'mental freedom' to confess to or deny a suspected participation in a crime."

From these decisions, we deduce the rule that unfairness in violation of due process exists when a confession is obtained by means of pressure exerted upon the accused under such circumstances that it affects the testimonial trustworthiness of the confession. Lisenba v. California, *supra*. See, also, the discussion in 3 Wigmore, Evidence (3 ed.) § 822. While in this state we have no statute such as the federal statute, or such as most states have, requiring that the arrested accused be immediately taken before a judge or magistrate, where, of course, he would be entitled to counsel (except Minn. St. 1941, § 629.14 [Mason St. 1940 Supp. § 10547-24], apparently enacted in favor of persons arrested in furtherance of extradition), we believe that fundamental fairness to the accused requires that he should with reasonable promptness be taken before a magistrate in order to prevent the application of methods approaching what is commonly called the "third degree." "Fundamental fairness" prohibits the secret inquisition in order to obtain evidence. Certainly, delay in arraignment is a circumstance to be considered with other facts tending to show that the accused was subjected to pressure to obtain a confession. In Ashcraft v. Tennessee, *supra*, 322 U. S. 143, 152, 64 S. Ct. 925, the United States Supreme Court said:

"In reaching our conclusion as to the validity of Ashcraft's confession we do not resolve any of the disputed questions of fact relating to the details of what transpired within the confession chamber of the jail or whether Ashcraft actually did confess. Such disputes, we may say, are an inescapable consequence of secret inquisitorial practices. And always evidence concerning the inner details of secret inquisitions is weighted against an accused, particularly where, as here, he is charged with a brutal crime, or where, as in many other cases, his supposed offense bears relation to an unpopular economic, political, or religious cause."

In the case at bar, Hastings is the county seat and it could hardly be contended that a judge or magistrate was not available on the morning on which Regina was arrested. On the record before us, the inference is irresistible that it did not suit the convenience of the prosecuting officers to take Regina before a magistrate until they had obtained a confession upon which a prosecution for murder could successfully be grounded. Coupled with the fact that Regina was mentally a child of eight years and ten months were the facts that, according to her testimony, under these very trying circumstances, her requests for her parents, her lawyer, her priest, and her doctor were not complied with until after she had signed the desired confession. She was subjected to extended questioning. Her first confession was not satisfactory. Were the evidence now before us all the evidence in the case as to the trustworthiness of the confession, we should have to say as a matter of law that its admission was a violation of due process under the decisions of the United States Supreme Court, which are binding upon us in federal questions; but, since all the evidence in regard to its voluntary character may not be here, we can only say that on a new trial, should the evidence now before us be contradicted to the extent that an issue of fact is created on the trustworthiness of the confession, that issue should be submitted to the jury under proper instructions. It was not so submitted.

The trial court no doubt followed the expressions in State v. Staley, 14 Minn. 105 (14 Gil. 75, 80), that where a confession is challenged as involuntary it is for the judge "to determine, as a preliminary question, whether the allegation is true in point of fact, and his decision of the question is, we think, subject to be reviewed by this court." This apparently followed the rule in the English courts, which rests solely on the arbitrary ground that the court is the sole judge of admissibility, which is normally the case. Bartlett v. Smith, 11 M & W (Ex.) 483 (1843). See, also, State v. Holden, 42 Minn. 350, 354, 44 N. W. 123, 124; State v. Nelson, 199 Minn. 86, 89, 90, 271 N. W. 114, 115, 116; and note to State v. Compo, 108 N. J. L. 499, 158 A. 541, 85 A. L. R. 866. Not-

withstanding what was said in State v. Staley, *supra,* and subsequent cases, we think that, as to confessions, the fairer and more enlightened rule as well as the one that assures the accused of a jury trial on fact issues, is that approved by such courts as Massachusetts, Michigan, Pennsylvania, and the Supreme Court of the United States.

The proper practice upon a challenge to the voluntary character of a confession is for the trial court, in the absence of the jury, to hear the evidence of both parties relating to its voluntary character. Commonwealth v. Culver, 126 Mass. 464, 465. If it concludes that the evidence is conclusive that the confession was involuntary, it should be excluded. If, on the other hand, there is a question of fact presented by the evidence as to its voluntary character, the evidence of the state should be presented to the jury so that the defendant may, when he puts in his case, present to the jury his evidence in opposition. It would of course be within the discretion of the trial court to permit the defendant to introduce his testimony in regard to the involuntary character of the confession when the state has concluded its testimony on that point. The jury should be instructed to wholly disregard the confession if it concludes that it was involuntary. People v. Howes, 81 Mich. 396, 402, 45 N. W. 961. If the jury finds that it was voluntary, then they should be the judges of its weight and credibility. Wilson v. United States, 162 U. S. 613, 624, 16 S. Ct. 895, 900, 40 L. ed. 1090, 1097, cites with approval Commonwealth v. Preece, 140 Mass. 276, 277, 5 N. E. 494, 495, where the court said:

"*When there is conflicting testimony,* the humane practice in this Commonwealth is for the judge, if he decides that it is admissible, to instruct the jury that they may consider all the evidence, and that they should exclude the confession, if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant." (Italics supplied.)

See, also, the line of Massachusetts, Michigan, Pennsylvania, and New York cases cited in 85 A. L. R. at p. 890, *et seq.* This was

the practice followed in greater part by the trial court in State v. Nelson, 199 Minn. 86, 271 N. W. 114, *supra,* which resulted in an affirmance here. Any inference to the contrary which may be drawn from the language of the Minnesota cases above cited is specifically overruled. If Regina's testimony is all the evidence on the voluntary character of the confession, it is conclusive against its admission.

■ Minn. St. 1941, § 481.10 (Mason St. 1927, § 5692), requires an officer having an accused in custody to grant a request for an interview with his counsel, and he shall notify such counsel "as soon as practicable, and before other proceedings shall be had." We interpret "other proceedings" to include an examination or in-quisition of the accused.

■ The county attorney in his argument to the jury said:

"* * * just as surely as she has killed her husband in cold blood, that same thing will happen to her son, or someone else if she is released. So, ladies and gentlemen, I submit to you that we have an additional responsibility in this case, not the usual responsibility to save society from this woman, but we have a responsibility to that little boy you saw testify in this courtroom, and, * * * I feel as I have never felt before, that the only way you can adequately discharge that responsibility is to find this defendant guilty of murder in the first degree."

These remarks were excepted to by the defendant, and the trial court noted the exception but did not tell the jury to disregard the remarks. We think they were prejudicial. It was improper even though there may have been evidence, unobjected to, of antagonism toward her son. The defendant was being tried for the murder of her husband, not for the probability that she might murder her son. In effect, this was an argument that she was a menace to her son and that it would be better for his sake to have her incarcerated than for her to be at large. By the jury it could not be understood otherwise than as an opinion that the accused was guilty of murder in the first degree. In State v. Clark, 114

Minn. 342, 344, 131 N. W. 369, 370, this court, speaking through Mr. Chief Justice Start, said:

"* * * The duties and obligations of a prosecuting officer are not simply those of an attorney in a civil action; for behind him, and largely at his command, are all the forces of organized society. He has by virtue of his office, if worthy of it, great influence with juries, and he should never forget that he is the representative of the sovereignty and justice of the state, and that he must bear himself, in the discharge of his official duties, as a minister of justice, and never as a partisan. He is not bound to make his argument to the jury colorless, or argue both sides of the case, if the defendant is represented by counsel; but he may present forcibly the state's side of the case. He is, however, never justified in thrusting his personality into the case, and *expressing his opinion that the defendant is guilty,* or stating as a fact anything except what the evidence tends to prove, or which he in good faith expects to prove. If he does otherwise, he is guilty of misconduct." (Italics supplied.)

Other complaints are made against the county attorney's closing argument, but, since they were not excepted to at the time and probably will not occur on another trial, we shall not discuss them.

Exceptions were also taken to the court's charge, which apparently was encumbered with the giving of many requests formulated by counsel and for that reason was calculated to be confusing to the jury. Some of them covered subjects upon which counsel contends there was no issue in the evidence. Others, on the question of self-defense, were at least of questionable correctness. The issues are very simple and should be submitted to a jury in clear statements understandable by them. Doubtless in a subsequent trial this will be done.

■ Complaint is also made that jurors rode back and forth from Hastings to South St. Paul with a bailiff who is alleged to have sat at the counsel table with the county attorney throughout the trial. We do not approve the practice.

Other questions raised do not require comment.

For the reasons stated, the order denying a new trial must be reversed and a new trial granted.

UPON APPLICATION FOR REARGUMENT.

On August 29, 1944, the following opinion was filed:

PER CURIAM.

The state's motion for recall of the remittitur is denied on the authority of State v. Waddell, 191 Minn. 475, 254 N. W. 627. The petition for rehearing is therefore denied as not made before the remittitur was sent down.

