## STATE v. JOHN FRANCIS BIRON.

123 N. W. (2d) 392.

August 16, 1963—No. 38,808.

*Lewis E. Lohmann* and *Gerald M. Singer,* for appellant.

*Walter F. Mondale,* Attorney General, *George M. Scott,* County Attorney, and *Gerard W. Snell,* Assistant County Attorney, for respondent.

*Robert G. Share* and *Henry W. Pickett, Jr.,* for Minnesota Branch, American Civil Liberties Union, amicus curiae.

MURPHY, JUSTICE.

This is an appeal from a judgment of conviction of murder in the third degree. Defendant asks that the judgment be set aside asserting as error the introduction in evidence of a written confession which he alleges was obtained in violation of his constitutional rights as guaranteed by the Fourteenth Amendment.

From the record it appears that in the early morning hours of March 10, 1962, one Mrs. Anne Danielski, an elderly woman, was attacked and beaten. Her body was found some hours later. She died shortly after having been taken to the hospital. Death was attributed to a combination of injuries and exposure. Defendant was apprehended as a result of information received by the Police Department of Minneapolis and taken into custody on the afternoon of March 16. At the time of his arrest the defendant was 18 years of age. He had left home and was residing with his married sister. He had a ninth-grade education and had no work record. At the time of his arrest he was under parole supervision by state authorities as a juvenile offender.

From admissions made by the defendant and a written confession, the voluntariness of which is the central issue in this case, it appears that on the evening of March 9, 1962, the defendant, in company with two juvenile companions, Walter White and Leonard Belcour, went to the latter's home about 10 p. m. Sometime between 10 and 11 p. m. they met an intoxicated woman on the street. They attacked her and took from her 64 cents, which was apparently all of the money she had. The record indicates that this offense was never reported to the authorities. The group then went to the home of the defendant's sister where they took the family automobile without permission and drove it about the streets until sometime after midnight. In the meantime they had consumed a quantity of wine which they had gotten from some other boys. While proceeding down a street in Northeast Minneapolis, they observed a woman walking

alone and decided to steal her purse. From the statement it appears that they all got out of the car to take the purse from the woman. She struggled with White, whereupon he struck her. In his confession the defendant admitted that he joined in the theft and struck the woman twice in the jaw and on the cheek. Belcour clubbed the woman with his arm which was in a cast. It should be noted that the defendant repudiated this confession within an hour after he signed it.

Reference should be made to the circumstances leading up to the signing of the confession as they appear from the record. It appears that the defendant was apprehended March 16 at about 4:30 p. m. In one of his first interviews with the officers at police head-quarters he admitted his part in the theft of 64 cents taken from the intoxicated woman on the night of March 9. This interview took place at the police headquarters, homicide division, between 6 and 8 p. m. and continued for a period of 1 hour and 35 minutes. It was tape recorded and comprises a part of the record on appeal. The defendant said he would like to have his sister call a lawyer. He did not indicate the name of a lawyer, but a telephone was made available to him. During this interview the detectives urged him to tell the truth and advised him that it would be in his own interest to do so. He persisted in his denial of any part in the attack upon Mrs. Danielski.

Sometime later on the evening of March 16 he was taken to the office of the inspector of the homicide division where a tape-recorded confession made by his companion, Walter White, was played back to him. By this confession White implicated the defendant as a participant in the attack upon Mrs. Danielski. This interview lasted for about 20 minutes. The next interview occurred apparently on the morning of Saturday, March 17, after the defendant had given the officers a sample of his hair. During this interview, which was likewise tape recorded, the defendant continued to profess his innocence. Between 1:30 and 2:30 in the afternoon of March 17 the defendant was again interviewed by the police officers. At this time the defendant expressed a fear of being sentenced to the state peni-

tentiary on a murder charge and discussed the possibility of having his case disposed of in the juvenile court. As we have already indicated, the defendant was familiar with juvenile court proceedings. It was suggested by the officers that although the defendant was just past 18 years of age he might, nevertheless, be permitted to plead as a juvenile offender in view of the fact that his two companions were under 18 years of age.[1] At that point the defendant refused to admit any knowledge of the circumstances surrounding the robbery and death of Mrs. Danielski. Detective Russell Krueger informed him that if he wished to make a statement later on he should have the jailer get in touch with him. Krueger testified that about 6 p. m. of the same day he was called to come and see the defendant, who informed him that he wanted to give a statement. The defendant said that he was sorry for what he had done and he would like to make amends to Mrs. Danielski's relatives. The defendant was informed that whatever statement he made could be used in court against him after which he gave the statement, the substance of which has already been recited.

At each of the interviews referred to, two or three police officers or detectives participated in the questioning of defendant. It is very apparent from an examination of what occurred at these interviews that the police officers were eager to secure a written confession in order to make an airtight case for the prosecution. They presented to the defendant various arguments and reasons why he should sign a confession. While much of what the officers said to the defendant was proper, and there was no evidence of threats or abuse of any kind, it is apparent from the record as a whole that their questions and statements were calculated to sell the defendant on the idea that he ought to sign a confession. In accomplishing this purpose they held out to the defendant the possibility that he might be charged with a lesser offense, or that he might, in view of his age and the

---

[1]Minn. St. 260.015, subd. 2, defines "child" within the meaning of the Juvenile Court Act as follows: " 'Child' means an individual under 18 years of age and includes any minor alleged to have been delinquent or a juvenile traffic offender prior to having become 18 years of age."

age of his juvenile companions, be given the benefits of juvenile court proceedings. The defendant was made aware of the fact that he was in serious trouble. He was told, "You're in lots of trouble. Now, it's your problem to get out of a little bit of it anyhow." He was told that the best way he could help himself was by helping the police officers. When the defendant persisted—"I told you all I know. That's all I am going to tell."—Detective Rieman told him that they could prove by comparing his hair with some they had that the defendant was implicated and "then we can take you right into a * * * courtroom * * * [a]nd then we can throw the key away because you're not smart enough to try and help yourself."

The detective also approached the subject from the degree of the offense with which the defendant might be charged. He said:

"* * * This thing wavers, it can be murder or it can be manslaughter. Now, if we get a young fellow that gets himself fouled up like you boys have done, and I am telling you, you done it. I ain't lying to you, you done it, you fouled up. You're in the crap, but good, right up to your ears. But the whole thing what you go to court for is determined on how you act when you are talking to us. The whole thing boils down to this; what kind of fellow was he, did he come in and say, 'Yes, we took her purse, we tried to take her purse, we didn't mean to hurt the woman.' But, I want to tell you a little about the law now. When you went after that purse, that's a felony; when a death results in the commission of a felony that's murder in the first degree. But, if a fellow has got brains enough to realize what a spot he is in it can go the other way, the people can say, the people that determine these things, our superiors, they can determine: 'Did these boys commit murder in the act of a felony or is it just a simple case of manslaughter? ' ". He then asked the defendant:

"Isn't it much better to go up for manslaughter than to go up for murder, number 1?"

After warning the defendant that by his failure to admit his part in the offense he was exposing himself to a long sentence, one of the detectives said:

"* * * John, make it easy on yourself, make it easy on yourself, Boy. You got a lot of life ahead of you and you are the only one that is going to determine how much of it you are going to be walking out on the street there. You're young now. You think they are going to slap you on the butt and say, 'Get out of here,' but we aren't going to do that. We're not going to promise you a thing other than that you are going to get a fair shake. I'm not going to tell you you are not going to the can; I'm not going to tell you you are not going to St. Cloud. In fact, I will tell you you are. You're the guy that's going to determine how long you're going to go there. Is it going to be five years, is it going to be one year, is it going to be two years or is it going to be a hundred years?"

The inspector later held out the hope of a lesser offense being charged when he told the defendant, "It could be as serious as murder or it could be as easy as manslaughter."

It then appears that the detectives adopted a different approach. One of them implied to the defendant that it would be better for him to have his case taken before a juvenile judge rather than "fight it before a jury." It was suggested to him that he might be taken to Judge Arthur, judge of the juvenile court. They said:

"* * * Judge Arthur will look over the whole thing, and he will say, 'Well, here this boy is 18 but he's just not very much older than the other two. I will handle all three of them.' You get the drift? But, this we can't do if you don't tell us. We can't go there and do that for you. You've got to tell us what went on."

The detective then went on to explain to him that if he failed to cooperate, "we can't go up there and get any break for you * * *. You're going to end up getting most of the blame because you are an adult." It was further suggested to him that by cooperating, he would avoid publicity that would embarrass his sister and mother.

In further explaining that the police officers would cooperate in having this case brought before the juvenile court where he would have a chance of securing lenient treatment as a juvenile offender, even though he was past 18 years of age and an adult, they told him:

"* * * Let's face it, after you are 18 you are an adult, you know that, don't you? But you can be 17 and 11 months and 29 days and still be a juvenile. So, the unfortunate thing with your part now is you are the one that's an adult, these other two guys are juveniles. It doesn't make any difference if they're 17 or if they are 11, they are all considered the same. And the same goes for you, it don't make any difference if you're 18 today or 90, but the difference would come in this way. There is three involved, two of them are very close to being 18 and one has just turned over 18. Now, it has to go through the juvenile court to start with, and at the discretion of that judge, he will decide if he will handle this complete case or if he will turn it over to another judge. So you are the 18-year-old. If you don't cooperate and tell us everything we won't even consider you going down and talking to the juvenile judge. We would go right before the grand jury, the county attorney, and take you right in there. Here is your two friends, probably in a different courtroom and you would be in the adult courtroom. Now, how do you think you would fare?

"But certainly if you don't tell the truth, your part of it, we can't give you any consideration at all."

He was further assured that the police department were his only friends. There was this colloquy:

"Mr. Short [a detective]: You see, if you keep holding tough and make us definitely prove that you were there, and, mark my word we will do it; if we have to go to them lengths you certainly can't expect any cooperation from us, can you? You are an adult, don't forget it. These other two guys, you've been handled by juvenile judges before, haven't you? Where would you rather, if you had your choice, and you are involved in this case, where would you rather be handled?

"Mr. Biron: Juvenile court.

"Mr. Short: Well, now, what have I been trying to tell you? These other two are juveniles so the judge, certainly the juvenile judge has to review their case. You are just a month past being a juvenile. He will read your case. Now, it is up to him, but it is my opinion

he will probably handle all three of you. But, he is not going to be monkeying with you if you don't cooperate and tell what you know about this.

\* \* \* \* \*

"Mr. Short: Are you still remembering that these two guys are juveniles?

"Mr. Biron: Yes, I know they're juveniles.

"Mr. Short: Don't forget that part of it."

In his testimony Captain Henry Deason of the Minneapolis police force said:

"A. I told him that he was just barely 18, the other two fellows were under 18 and I told him I didn't know how this case was going to be handled. If he was under 18 I told him those fellows might be handled by the juvenile court and you, being just over 18, might stand trial with them; then again the juvenile judge might bind the two themselves over to District Court and, or to the grand jury and all three of them be taken together. I didn't know I told him."

At one point the defendant said:

"Well, I want to get it over with. I don't care what I get. I just want to get it over with."

When asked about the defendant's attitude immediately after he gave the statement, Detective Krueger testified:

"A. He was very remorseful, he kept—he was crying all during the statement and visibly shaken and he was still crying, on and off, he would start to cry and he was very—I felt sorry for the kid.

\* \* \* \* \*

"Q. Was the defendant nervous during the taking of the statement?

"A. Well, he was crying and he was shaking, he was sobbing pretty hard and his whole body was quivering."

At this point it should be noted that the defendant was not prosecuted for manslaughter nor was he given juvenile court treatment.

He was convicted as an adult of murder in the third degree. At the trial the defense objected to the introduction of the confession in evidence as part of the state's case. The trial court thereupon heard evidence relating to the voluntary character of the confession out of the presence of the jury. He determined that a question of fact was presented, and following the procedure outlined in State v. Schabert, 218 Minn. 1, 15 N. W. (2d) 585, permitted the defendant to introduce his testimony in regard to that issue after the state had concluded its evidence thereon.

We are thus squarely faced with the question whether on the record before us the defendant was deprived of due process of law by use at trial of a confession induced by improper statements, promises, and conduct of the police officers. Although there is not a great deal of authority in this state bearing upon this issue, what we have said on the subject is not in conflict with recent important decisions of the United States Supreme Court.[2] In the old case of State v. Staley, 14 Minn. 75 at 79 (105 at 110), we said:

"* * * The rule seems well settled that if an advantage is held out, or harm threatened, of a temporal or worldly nature, by a person in authority, the confession induced thereby must be excluded."

In State v. Schabert, 218 Minn. 1, 6, 15 N. W. (2d) 585, 587, we said:

"* * * unfairness in violation of due process exists when a confession is obtained by means of pressure exerted upon the accused under such circumstances that it affects the testimonial trustworthiness of the confession."

Moreover, it is important for us to keep in mind that since the issue before us involves a basic constitutional right the standards upon which the issue of voluntariness must be appraised are those expressed by decisions of the United States Supreme Court. The policy of that court, stated in the recent case of Haynes v. Washing-

---

[2]Lynumn v. Illinois, 372 U. S. 528, 83 S. Ct. 917, 9 L. ed. (2d) 922; Haynes v. Washington, 373 U. S. 503, 83 S. Ct. 1336, 10 L. ed. (2d) 513.

ton, 373 U. S. 503, 515, 83 S. Ct. 1336, 1344, 10 L. ed. (2d) 513, 522, is as follows:

"It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an *independent* determination here, see, e. g., Ashcraft v. Tennessee, 322 U. S. 143, 147-148; 'we cannot escape the responsibility of making our own examination of the record,' Spano v. New York, 360 U. S. 315, 316. While, for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to the ultimate conclusion on the crucial issue of voluntariness, we cannot avoid our responsibilities by permitting ourselves to be 'completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.' Stein v. New York, 346 U. S. 156, 181. As state courts are, in instances such as this, charged with the primary responsibility of protecting basic and essential rights, we accord an appropriate and substantial effect to their resolutions of conflicts in evidence as to the occurrence or nonoccurrence of factual events and happenings. This is particularly apposite because the trial judge and jury are closest to the trial scene and thus afforded the best opportunity to evaluate contradictory testimony. But, as declared in Ward v. Texas, 316 U. S. 547, 550, 'when, as in this case, the question is properly raised as to whether a defendant has been denied due process of law * * * we cannot be precluded by the verdict of a jury from determining whether the circumstances under which the confession was made were such that its admission in evidence amounts to a denial of due process.' "

The Haynes case involved the issue of due process as it applied to the voluntariness of a confession secured from a defendant who was held for a 16-hour period and not allowed to call his wife or an attorney until he "cooperated" with the police in giving them a

signed confession admitting participation in the offense with which he was ultimately charged. It was there held that if from the evidence as a whole it appeared that the confession was induced by force, threats, or promises, or other improper inducements, the question of due process is one of law alone and the statement should be rejected. In discussing the issue of voluntariness of the confession, the court said (373 U. S. 513, 83 S. Ct. 1343, 10 L. ed. [2d] 520):

"* * * 'the question in each case is whether the defendant's will was overborne at the time he confessed,' Lynumn v. Illinois, 372 U. S. 528, 534. 'In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort.' "

If we accept the foregoing test of admissibility, we must conclude that the statements and representations made by the officers to the defendant in this case constituted a sufficient inducement to deprive the confession of its voluntary character. The total circumstances under which the confession was given establish as a matter of law that it was induced by the statements and representations of the police officers. Their statements and representations were persuasive and could only have had the effect of implanting in the defendant's mind the hope that he would be treated as a juvenile offender or that in any event the charge against him might ultimately be disposed of on the basis of a lesser charge than the crime to which he confessed.

It should be realistically conceded that the trustworthiness of a confession should not in every instance be discounted because investigative officers in their interviews might have made discursive or imprecise statements to the defendant. But it should also be conceded that persuasive arguments calculated to induce a confession might be as objectionable as outright coercion. In persuading the defendant that he might be treated as a juvenile offender rather than to expose himself to the grave penalties of a felony murder, the officers went too far. The statement of the Supreme Court of Iowa in State v. Mullin, 249 Iowa 10, 16, 85 N. W. (2d) 598, 601, is appropriate to the situation here. They said:

"* * * However, when the officer or officers go further and explain just how it will be better or wiser for the accused to speak, these statements may suddenly become more than an admonishment and assume the character of an assurance or promise of special treatment which may well destroy the voluntary nature of the confession in the eyes of the law."

The error cannot be disregarded on the ground that the record contains sufficient other evidence to sustain the conviction and that the same result will follow on retrial. Recent decisions of the Supreme Court of the United States have made it clear that the principle at stake is more important than the expense and inconvenience which will be involved in a new trial. Lynumn v. Illinois, 372 U. S. 528, 83 S. Ct. 917, 9 L. ed. (2d) 922; Haynes v. Washington, 373 U. S. 503, 83 S. Ct. 1336, 10 L. ed. (2d) 513; Fay v. Noia, 372 U. S. 391, 83 S. Ct. 822, 9 L. ed. (2d) 837; Townsend v. Sain, 372 U. S. 293, 83 S. Ct. 745, 9 L. ed. (2d) 770.

The judgment of conviction is reversed and a new trial is granted. Reversed.