STATE of Minnesota, Respondent,

v.

Irving NMN THAGGARD,
Petitioner, Appellant.

No. CX–93–667.

Supreme Court of Minnesota.

January 20, 1995.

As Amended Jan. 19, 1995.

John M. Stuart, State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Linda M. Freyer, Asst. County Atty., Minneapolis, for respondent.

Heard, considered and decided by the court en banc.

## OPINION

COYNE, Justice.

Defendant, Irving Thaggard, was found guilty by a district court jury of criminal

sexual conduct in the first degree and was sentenced by the trial court to a prison term of 110 months. The court of appeals, in an unpublished decision, affirmed his conviction on direct appeal from judgment of conviction. We granted defendant's petition for review in order to examine defendant's arguments (1) that the state failed to meet its burden of establishing that his confession was voluntary and therefore admissible and (2) that the prosecutor committed prejudicial misconduct in closing argument. After carefully examining these arguments, we affirm.

The police first became involved in this case on August 7, 1992, when they received a call to come to a house in North Minneapolis. Complainant, 34-year-old R.N., a crack cocaine addict, who did not know the occupants of the house, had appeared there naked late on the 7th, claiming, "He's going to kill me." R.N. was taken to North Memorial Medical Center. Medical personnel there found that she had a broken jaw, that she had had recent sexual intercourse, and that there were abrasions in the anal area. R.N. told police that she had been abducted off the street by two men, raped and beaten.

We now know that for some time R.N. lied, at least in substantial part, to the police. In fact, she had not been abducted. Rather, defendant and his friend, Mario Owens, had offered her a ride that afternoon and she had accepted the ride. On the way to dropping her off at her cousin's house, they had asked her if she wanted to join them later and she had said yes. They had picked her up later, and drunk liquor with her, had smoked marijuana with her, and later had each twice engaged in consensual oral and vaginal sex with her in exchange for providing her with crack cocaine. Later in the evening she became suspicious that the men might give her "problems" in getting away from them, so she pulled a knife out of her bag. It was then that defendant hit her in the jaw.

What was disputed at trial was whether defendant and Owens had then raped her. R.N. claimed in her testimony that they had done so. The defense argued that R.N. could not be believed, that what really happened was what defendant initially had told the police when he was arrested and questioned, that the acts of intercourse with R.N. that occurred after defendant hit her were just like the earlier acts of intercourse—consensual.

Given the fact that complainant had lied so extensively in her statements to the police about the events preceding the blow to the jaw and the final acts of intercourse, one cannot say with any confidence that the jury probably would have convicted defendant of criminal sexual conduct had it not had defendant's ultimate confession. Therefore, the issue of whether the trial court properly admitted the confession is necessarily critical to the outcome of this appeal.

The officer who obtained the confession, Sergeant Bernard Martinson, testified at the omnibus or pre-trial suppression hearing about the circumstances surrounding the making of the confession. Specifically, he testified that his interrogation of defendant at the jail was in two parts: The first part, which he called a "pre-interview," was unrecorded; the second part, the formal confession, was recorded. Martinson testified on direct that during the "pre-interview" phase (a) he gave defendant a *Miranda* warning and obtained a waiver; (b) he lied to defendant, telling him that Owens had confessed to participating in the rape of R.N.; and (c) he made no promises to defendant. He testified further that his written report accurately summarized his entire interview of defendant and that a second exhibit was a verbatim transcript of the taped formal confession. The record does not contain the written summary of the first part of the interrogation. However, it appears that during the early part of the "pre-interview" interview defendant told Martinson that R.N. had willingly accompanied and partied with the men and that he had hit her because she said she was "tripping out." Martinson later would testify at trial that defendant seemed surprised to learn that R.N.'s jaw had been broken. It appears that defendant maintained that R.N. had again had sex with Owens and him after he hit her when she started tripping out. He claimed that she then got out of the car and ran down the alley. It appears that it was only after Martinson lied to defendant, falsely telling him that Owens had confessed, that

defendant confessed to raping R.N. Asked on cross-examination at the omnibus hearing if he had promised defendant drug treatment if he confessed, Martinson denied it. He admitted that defendant's cocaine problem had come up, denied promising treatment, admitted that he tries to be reassuring to all people he is interrogating because he wants them "to speak with me and cooperate," and admitted that treatment was "something that he was looking at for himself to get."

Defendant testified at the omnibus hearing that he gave the formal taped statement only after Martinson told him, "All I see is that you are all out partying and things got out of hand. By being drug related, you probably would be referred to treatment." Defendant said Martinson told him that in order to get treatment, however, he would have to "tell him up front what happened."

We do not know for sure how long the "pre-interview" interview lasted. Martinson first testified at trial that it lasted from noon to 2:30 p.m., when the recording of the 17–minute formal statement began. However, he later retracted this, saying that the "pre-interview" might not have begun until 1:45 or 1:50 p.m.

The record on appeal contains a copy of the transcript of the taped formal statement. In it defendant answered "yeah" when Martinson asked him if it was true that defendant had told him that he fractured R.N.'s jaw and then had sexual intercourse with her against her will, along with Owens. Later in the statement, defendant said that he had hit her only after "she started trippin' and one thing led to another." He said that he hit her "[j]ust once." Asked if he "now" realized that he should not have had sex with her after hitting her, he said "yeah." Asked if he realized that she did not want to have sex after she had been hit, he said "yeah." Defendant said that he was "spaced out on the drugs at the time" but that he "now" understood that he had committed a crime. He added:

I didn't really mean to harm her like that, no kind of way, we were just gettin' high on crack and everything just went sour, that's all. I'm an addict, I admit to that and I would like to apologize to her,

but I know that wouldn't ease her pain. I'd like to get some help some kind of way.

Asked the standard question whether the statement was given of his own free will without threats or promises, defendant said "yes."

The trial court denied the motion to suppress the confession, crediting the testimony of Martinson relating to whether a promise of treatment was made.

■ 1. In a pre-trial suppression hearing at which the defendant seeks suppression of a confession on the ground that the confession was involuntary, the state has the burden of proving voluntariness by a fair preponderance of the evidence. *Doan v. State,* 306 Minn. 89, 91, 234 N.W.2d 824, 826 (1975).

■ It is the trial court's role, in such a case, to resolve any evidentiary disputes as to the historical facts. *State v. (Howard) Anderson,* 396 N.W.2d 564, 565 (Minn.1986).

■ The appellate court is not bound by the trial court's determination of whether or not the confession was voluntary. Rather, its duty is "to independently determine, on the basis of all factual findings that are not clearly erroneous, whether or not the confession was voluntary." *Id.*

■ Recently, in *State v. Scales,* 518 N.W.2d 587 (Minn.1994), we adopted a recording requirement with respect to custodial interrogation of criminal suspects. Specifically, we held:

[A]ll custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention. If law enforcement officers fail to comply with this recording requirement, any statements the suspect makes in response to the interrogation may be suppressed at trial.

518 N.W.2d at 592. The primary purpose of the requirement is not to help criminal defendants or to help the state. Rather, the primary purpose is to assist the trial court in the resolution of evidentiary disputes and in more accurately determining the underlying

facts. Furthermore, the requirement will aid in appellate review of rulings on motions to suppress confessions.

Our decision in *Scales,* which we based on our inherent supervisory power to insure the fair administration of criminal justice, was prospective in nature, applying to interrogations occurring from the date of the filing of our opinion, June 30, 1994. *Id.* at 592–93. The interrogation in this case occurred before the decision in *Scales* was filed.

If *Scales* applied, then Sergeant Martinson in this case would have been legally obliged to tape record not just the so-called "formal statement" by the defendant but the entire custodial interrogation, including the giving of the *Miranda* warning, the obtaining of a waiver, and that part of the interrogation that Sergeant Martinson euphemistically referred to as the "pre-interview."

█ As it is, we must review the voluntariness issue without the benefit of the information a complete recording would have provided. While the trial court undoubtedly could have taken Sergeant Martinson's failure to record the "pre-interview" into consideration in assessing the credibility of his testimony concerning what he said to defendant, the trial court was not obliged to discredit Martinson's testimony.

█ With this in mind, we address defendant's claim that his confession was involuntary. As we have noted in numerous cases, we look to all the relevant factors in determining the voluntariness of a confession. These factors include the defendant's age, maturity, intelligence, education, experience and ability to comprehend; the lack of or adequacy of a warning; the length and legality of the detention; the nature of the interrogation; and whether the defendant was deprived of physical needs or denied access to friends. *State v. Jungbauer,* 348 N.W.2d 344, 346 (Minn.1984).

Defendant focuses our attention upon the nature of the interrogation in his case, pointing to (a) deception admittedly used by Sergeant Martinson and (b) the alleged promise of treatment.

(a) The use of trickery and deception by police in obtaining confessions is analyzed in considerable detail in the Commentary to § 140.4 of the Model Code of Pre–Arraignment Procedure (1975), which states in part:

One of the most difficult questions in connection with the Code is determining what should be provided with respect to the use of deception in seeking information from suspects. The propriety of techniques such as those catalogued in detail in Inbau and Reid, *Criminal Interrogation and Confessions* (1962), was severely criticized by the Chief Justice in *Miranda.* In 1967 the authors came out with a revised edition of *Criminal Interrogation and Confessions,* advocating exactly the same techniques, but warning officers to obtain a *Miranda* waiver before engaging in any of them, the authors regarding the *Miranda* waiver as an insulating factor with respect to their interrogations techniques.

Deception in police interrogation can take many forms. It may consist of "conning"—seeking to offset the suspect's reluctance to incriminate himself by displays of apparent sympathy, friendship, or moral indignation. It may consist of misrepresentations which make the case against him appear stronger than it is or which understate the seriousness of his situation. It may consist of misstating the suspect's legal position by statements relating either to the substantive crime or his procedural rights. It may involve the use of persons appearing to be in a special confidential relationship with the suspect for the purpose of eliciting statements which he would not make to the police. Or it may involve eavesdropping, or the use of undercover operators or informers. Of course, this is by no means a complete catalogue, and the lines between these and other forms of deception are not easy to perceive or define.

Strong arguments can be made condemning all deceptive practices by officials investigating crime. Such practices appear to be "dirty business," and to some it is repellent that public officials should ever be expected to resort to tactics which violate the standards of dignity and probity for the conduct of government or society generally. Any departure from the high-

est standards, it is argued, not only fosters cynicism in the public at large but a callousness in the officials themselves which it is hard then to contain within the bounds of the special need which is supposed to justify it. On the other hand, it can be argued that the control of crime involves officials with persons who have manifested a willingness to do violence to even the most elemental decencies, and effective measures of control must take this into account.

Preliminary Draft No. 1 of the Code had a specific section which barred certain deceptive practices. Discussions at the first meeting of the Advisory Committee and further consideration convinced the Reporters that it would be unwise to include such a formulation. Any attempt to deal with certain forms of deception might create the inference, unacceptable to many, that the Institute approves of those deceptions which are not specifically enumerated. On the other hand, a flat bar to all deception in police investigation would invite a detailed probing by the court into the motivation of the questioning officers and the structure of the case at the time of interrogation, and might result in the exclusion of statements which (as in the case where the officer pretends to be friendly, or says, perhaps in good faith but without sufficient foundation in fact, that there exists "plenty" of evidence against the defendant) many would consider not unfairly obtained in such a context.

The Reporter believes that the issue of deception is one which should be left to the courts to pass upon as part of the broader inquiry which they must make under Clause (b) of Section 140.4.[1] The one exception is that, for the reasons indicated in the Note and Commentary to Section 140.2, deception which undermines the warning issued to an arrested person that he is not obligated to make a statement is explicitly barred.

\*        \*        \*        \*        \*        \*

Preliminary Draft No. 1 explicitly barred misleading a person "as to the strength of the case against him or the consequences of conviction." This was intended to deal with what is presumably the most common form of deception—leading a suspect to believe that the evidence against him is stronger than it is. For example, he may be told that he has been identified by the victim or another witness or that an alleged accomplice has implicated him. He may be told that his fingerprints were found on the murder weapon or at the scene of the crime. Quite aside from other questions they raise, these practices may carry with them a significant danger that an innocent man will admit the crime and plead guilty in the hope of obtaining leniency. Nevertheless, courts presented with this kind of deception have upheld the admissibility of any resulting statement, except to the extent that they have found that making the suspect believe his situation hopeless, combined with other circumstances, constitutes coercion.

Model Code of Pre–Arraignment Procedure, Commentary to § 140.4 at 355–57 (1975) (footnotes omitted). As alluded to in the Comment, Chief Justice Warren in *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966), expressly condemned the use of trickery and deception in order to persuade a suspect to waive his or her *Miranda* rights, stating: "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Whatever else was meant by this, it seems clear that "there is an absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of any of the applicable rights or as to whether the waiver really is a waiver of those

---

1. Section 140.4 provides:

No law enforcement officer shall attempt to induce an arrested person to make a statement or otherwise cooperate by

(a) questioning of such unfair frequency, length or persistence as to constitute harassment of such person; or

(b) any other method which, in light of such person's age, intelligence and mental and physical condition, unfairly undermines his ability to make a choice whether to make a statement or otherwise cooperate.

rights." 1 Wayne LaFave and Jerrold Israel, *Criminal Procedure* § 6.9(c) at 529 (1984) (footnotes omitted); *see also Moran v. Burbine*, 475 U.S. 412, 423–24, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986) ("withholding of information is objectionable as a matter of ethics" but "such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them").

It also seems clear, however, that the Court itself did not intend to adopt a per se rule of exclusion of all post-waiver confessions and statements induced by the use of trickery and deceit. In *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the Court was presented with the question whether a confession should have been excluded as involuntary because the police falsely told the suspect that the person he was with confessed. The Court in an opinion by Justice Marshall, said:

> Petitioner also presses the \* \* \* argument that his confession was involuntary and that it should have been excluded for that reason. The trial judge, after an evidentiary hearing during which the tape recording was played, could not agree with this contention, and our reading of the record does not lead us to a contrary conclusion. Before petitioner made any incriminating statements, he received partial warnings of his constitutional rights; this is, of course, a circumstance quite relevant to a finding of voluntariness. The questioning was of short duration, and petitioner was a mature individual of normal intelligence. *The fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.* These cases must be decided by viewing the "totality of the circumstances," and on the facts of this case we can find no error in the admission of petitioner's confession.

394 U.S. at 739, 89 S.Ct. at 1425 (citations omitted) (emphasis added).

■ Subsequent decisions of the Court confirm our understanding that the use of trickery and deception is to be considered along with all the other relevant factors in determining if a confession was involuntary, and that lying to a suspect as to the strength of the state's case against him generally is not by itself enough to render a confession involuntary. *See, e.g., Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987), stating that a confession should not be ruled involuntary absent evidence that the suspect's will was overborne and his capacity for self-determination critically impaired by *coercive* police conduct, and *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986), stating that "all" the involuntariness cases "have contained a substantial element of coercive police conduct." *Accord State v. Moorman*, 505 N.W.2d 593 (Minn.1993); *State v. Garner*, 294 N.W.2d 725 (Minn.1980).

We are not prepared at this time to abandon the totality of the circumstances approach, but we caution police that they proceed on thin ice and at their own risk when they use deception of the sort used in this case.

(b) The Model Code of Pre–Arraignment Procedure does not prohibit promises of leniency as a means of obtaining confessions, for the simple reason that "[t]here are many situations where it seems justifiable for law enforcement officers to make such promises in order to solve other crimes or apprehend or convict other persons." Model Code of Pre–Arraignment Procedure § 150.2(8), note at 65 (1975). Nevertheless, the Code "makes inadmissible statements obtained by promises of leniency for the arrested person or one in whom he is interested." *Id.*, Commentary to § 150.2(8) at 392.

The United States Supreme Court in *Bram v. United States*, 168 U.S. 532, 565, 18 S.Ct. 183, 195, 42 L.Ed. 568 (1897), ordered a new trial for a defendant on the ground that the trial court wrongfully admitted a statement made by the defendant in response to police "encouragement that by so doing he might at least obtain a mitigation of the punishment." The Court in *Bram* declared that a confession "obtained by any direct or implied promises, however slight," is not voluntary. *Id.* at 542–43, 18 S.Ct. at 187.

Subsequent decisions established, however, that, as we put it in *State v. (Kevin) Anderson,* 298 N.W.2d 63, 65 (Minn.1980), "courts do not mechanically hold confessions involuntary just because a promise has been involved." Rather, the approach courts have taken is to "look to the totality of the circumstances, considering all the factors bearing on voluntariness." *Id.* (citing *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)).

■ Sometimes the making of a promise will render a confession involuntary, sometimes not. In *Lynumn,* the Court held a confession involuntary where the police had stated that if the defendant did not cooperate she would be deprived of financial aid for her children, that her children might be taken from her and she might never see them again. 372 U.S. at 534, 83 S.Ct. at 920. In *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), the Court held involuntary a confession that was obtained by police after they threatened to arrest the defendant's wife. But in *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), the Court held voluntary a confession given by the defendant after receiving assurances that his father would be released from jail and his brother would not be charged with a parole violation. Speaking for the Court in *Stein,* Justice Jackson stated, in part:

> What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.
>
>       *    *    *    *    *    *
>
> The spectacle of [defendant] naming his own terms for confession, deciding for himself with whom he would negotiate, getting what he wanted as a consideration for telling what he knew, reduces to absurdity his present claim that he was coerced into confession.

346 U.S. at 185–86, 73 S.Ct. at 1093.

In *State v. (Howard) Anderson,* 396 N.W.2d 564, 565 (Minn.1986), remanding to trial court to make necessary findings of historical fact, we summarized some of our prior decisions dealing with the use of promises as follows:

> *State v. Beckman,* 354 N.W.2d 432 (Minn.1984) (the fact that defendant was told that any cooperation would be brought to the trial court's attention did not render confession "involuntary"); *State v. Jungbauer,* 348 N.W.2d 344 (Minn.1984) (promise to release defendant pending formal charging and to summon him rather than arrest him on a warrant did not render defendant's confession "involuntary"); *State v. [Kevin] Anderson,* 298 N.W.2d 63 (Minn.1980) (promise to a defendant that a female friend would be released from jail if he gave a written statement did not render his confession "involuntary"); *State v. Biron,* 266 Minn. 272, 123 N.W.2d 392 (1963) (holding "involuntary" a confession obtained from an 18–year–old who was promised juvenile treatment if he confessed). *Cf., Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), and *State v. Murphy,* 380 N.W.2d 766 (Minn. 1986) (upholding trial court's admission of confession by probationer to probation agent, despite probation agent's statement to probationer that her main concern was that he would need further treatment— implying that confession would lead to treatment).

396 N.W.2d at 565.

■ It should be apparent, by now, that— with respect to the use of trickery and deceit—police invite suppression of the statement when they use promises, express or implied, in seeking to persuade a suspect to confess to a crime.

■ (c) Turning now to the facts of this case, which we have carefully considered, we conclude that the trial court did not err in rejecting defendant's contention that his confession was involuntary. We note initially that defense counsel did not object in the trial court to the use of deception by Sergeant Martinson. Rather, defense counsel argued that the statement was given in exchange for an implied promise of drug treatment. The trial court found that although defendant may have believed he might receive treatment, he understood the *Miranda* warning that any statement he made would be used against him and he was not told, nor

was it implied, that he would not be prosecuted for the rape if he gave a statement. We add to these factors the fact that defendant had prior experience with the criminal justice system, including several felony convictions; defendant was interrogated early in the afternoon for a relatively short period of time; the interrogation was conducted by only one officer; defendant was permitted to take a break and use the bathroom when he wanted to do so; the absence of any claim that he was intoxicated during the interview; and the absence of any claim of threats or physical intimidation. The key fact, however, is the fact that there is no indication that defendant was led to believe that he would not be prosecuted for the rape if he confessed. The record indicates that defendant may have been led to expect that he would receive treatment but he was not led to expect that the treatment would be instead of prosecution and punishment.

2. The other issue meriting discussion is the claim of prosecutorial misconduct in closing argument. We have independently reviewed the entire closing argument. Having done this, we conclude that the argument, while clearly not a model argument, was not so improper that it necessitates the award of a new trial to defendant. However, in the interest of preventing further error in other cases, we briefly summarize the improprieties that occurred:

(a) The prosecutor repeatedly argued to the jury that the jury's role was to *determine if the evidence was sufficient to convict.* This was a constant refrain of the prosecutor. One of the prosecutor's final admonitions to the jury was, "find him guilty you must do because the evidence supports it." Whether the evidence supports a conviction is a judicial role. The jury has to be convinced that the defendant is guilty beyond a reasonable doubt before it finds him guilty; it is not enough that the jury determines in some dispassionate way that the evidence "supports" a conviction. Here defense counsel did not object. Moreover, the trial court gave the standard jury instructions, which state that the jury must be convinced beyond a reasonable doubt of the defendant's guilt. Nonetheless, the argument is improper and

we emphasize that if prosecutors use it in the future they will risk reversal in the interests of justice, even if prejudice is not apparent. *See, e.g., State v. Salitros,* 499 N.W.2d 815, 820 (Minn.1993).

(b) Again without objection, the prosecutor at one point asked the jury, "how can I put you in her [R.N.'s] life?" It is improper to ask the jurors directly to put themselves in the victim's shoes. *State v. Johnson,* 324 N.W.2d 199, 202 (Minn.1982).

(c) Without objection, the prosecutor improperly suggested to the jury that it could not reject R.N.'s testimony as false because there was no direct evidence that she was lying or had a motive to lie. It is proper for a prosecutor to tell the jury that defense counsel's questioning of the victim suggesting that she was lying does not constitute evidence. However the statement by the prosecutor was improper because a jury is always free to reject a complainant's testimony even if there is no direct evidence that the complainant has lied or has a motive to lie.

(d) Without objection, the prosecutor not only endorsed the testimony of Sergeant Martinson, referring to him as a "good cop," but said, "We all hear and read about sex crimes in the City of Minneapolis. He's the guy that investigates those kinds of things," then added that if Martinson had not done his job and gotten defendant to confess, defendant "would have walked out of here factually a rapist" with the state being unable to obtain a conviction. He then added that Martinson—this "good cop" who used "[g]ood, good police work"—did not believe defendant's denial of guilt and in effect saved the day by getting defendant to confess.

(e) The prosecutor, again without objection, referred to the fact that defendant was associated with the "Gangster Disciples" and argued that therefore defendant is "street wise" and "knew it was a rape."

As we have said before, a prosecutor is a " 'minister of justice' whose obligation is 'to guard the rights of the accused as well as to enforce the rights of the public.' " *Salitros,* 499 N.W.2d at 817 (quoting I ABA Standards for Criminal Justice, The Prosecution Func-

tion 3–1.1 and Commentary at 3.7 (2d ed. 1979)). We take very seriously our role of insuring that a criminal defendant, no matter the nature of the charge against him or her, receives a fair trial. We have made it clear on a number of recent occasions to prosecutors who persist in making improper arguments in closing argument that we will, in appropriate cases, exercise our power to reverse prophylactically or in the interests of justice. *Id.* at 820. In this case we believe that the defendant received a fair trial and we conclude that the interest of justice does not demand a new trial.

Affirmed.

ANDERSON, J., took no part in the consideration or decision of this case.