STATE OF MINNESOTA

IN SUPREME COURT

A15-0085

Scott County

State of Minnesota,

          Respondent,

vs.

Anthony James Cox,

          Appellant.

Dietzen, J.
Dissenting, Anderson, J., Gildea, C.J.
Took no part, Chutich J.

Filed: August 24, 2016
Office of Appellate Courts

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Ronald Hocevar, Scott County Attorney, Todd P. Zettler, Assistant Scott County Attorney, Shakopee, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court did not commit reversible error when it denied appellant's motion to suppress his confession. The totality of the circumstances establish that the confession was voluntary and that appellant's will was not overborne at the time of the confession.

1

2.     The evidence was sufficient to support appellant's conviction of first-degree premeditated murder.  Specifically, the circumstances proved regarding appellant's planning activity, the nature of the killing, and appellant's conduct following the murder, examined as a whole, are consistent with a rational inference that appellant premeditated the murder and inconsistent with a rational inference that appellant's conduct was the result of a rash impulse.

Affirmed.

O P I N I O N

DIETZEN, Justice.

Appellant Anthony James Cox was found guilty by a Scott County jury of first-degree premeditated murder, two counts of first-degree intentional felony murder (burglary and aggravated robbery), and first-degree aggravated robbery.  The murder charges arose out of the death of Aaron Moran on October 22, 2013.  Prior to trial, the district court denied Cox's motion to suppress a statement he made to the police.  The district court sentenced Cox to life without the possibility of release for the first-degree premeditated murder conviction and a concurrent 81-month sentence for the first-degree aggravated robbery conviction.  For the reasons that follow, we affirm.

In October 2013, Cox and his friend Brooks Kurr decided to rob Aaron Moran at his home in Shakopee, Minnesota.  Although Cox had never met Moran, Kurr knew Moran quite well.  Between September 2012 and September 2013, Kurr and Moran worked together at Affordable Town Car.  Kurr had driven to Moran's home several times, knew he often carried cash, and had seen him possess marijuana.  Thus, Kurr believed Moran

2

was a drug dealer who might have drugs and money at his home. By October 2013, Kurr's relationship with Moran had soured because Kurr believed he lost his job at Affordable Town Car in part due to Moran and that Moran had set him up to be robbed on two prior occasions. In fact, when the police later asked personnel at Affordable Town Car if they could think of anyone who might have "a reason to hurt" Moran, they immediately identified Kurr.

On the night of October 8, 2013, Kurr and Cox organized an attempt to rob Moran. Kurr drove Cox past Moran's home, parked a few blocks away, and gave Cox a .38 caliber handgun "for intimidation purposes and, . . . if necessary, force" to accomplish the robbery. Because Moran might recognize Kurr, Cox agreed to commit the robbery by himself. Cox stepped out of the car and walked in the general direction of Moran's home. As Cox walked through the neighborhood, he became lost and was unable to locate Moran's home. He therefore abandoned the robbery that night.

Sometime between October 8 and October 22, Cox purchased a .357 magnum revolver. The revolver had the capacity to hold six bullets. Cox would later tell police he developed "pretty good aim," and when he went to the gun range he used a two-handed grip.

On the night of October 22, 2013, Kurr and Cox returned to Moran's neighborhood. On this occasion, Cox knew the exact location of Moran's home. The plan was the same as on October 8, except that this time Cox brought the fully loaded .357 magnum. Cox

3

wore a mismatched pair of gloves. On his right hand, he wore a "pistol grip-type glove."[1]

On his left hand he wore a cotton glove. Cox also placed extra bullets in his pocket.

When Cox unlawfully entered Moran's home, he encountered Moran's 15-year-old nephew B.M., who was playing a video game. Cox told B.M. "this is a robbery" and directed him to pause the video game. After closing the curtains, Cox asked B.M. if anyone else was present in the home. When B.M. indicated that no one else was present, Cox asked, "If there [is] someone in the house [is it] okay if I just killed everybody . . . ?"[2] Cox then directed B.M. to take him on a tour of the home.

As B.M. stood up and began walking towards the hallway, Moran walked in the front door and said, "Whoa." Cox raised the .357 magnum from his side and pointed it at Moran. Looking back and forth between Cox and B.M, Moran smiled, apparently believing that Cox's presence was some kind of joke. Cox did not tell Moran that this was a robbery or demand any cash or drugs. Instead, Cox said, "This is the one I'm looking for." A few seconds later, Moran's cell phone began to ring. As Moran reached for the phone, Cox repeatedly ordered Moran to show his hands. Ignoring Cox's orders, Moran pulled the phone completely out of his pocket. B.M. could see that the object in Moran's hand was a phone. Cox ordered Moran to "put down the phone." When Moran ignored

---

[1]    A pistol grip glove or "shooter's glove" is a glove "worn by individuals shooting guns to lessen the recoil shock" and "sold separately rather than in a pair; it is intended to be worn on the trigger hand alone." U.S. Customs & Border Protection, HQ 083694 (1989).

[2]    This quote is taken from Cox's own statement to police. B.M. testified that Cox replied, "If you're lying, would it be alright if I shoot you?"

that order, Cox shot Moran in the right thigh, shattering his femur. B.M. turned away and covered his ears. According to B.M., 40 seconds elapsed between the first order and the first shot. Cox later told the police that the "[f]irst time I shot him I didn't just pow pow." Instead, Cox offered Moran another opportunity to comply with his orders. When Moran continued to ignore his commands, Cox fired a second shot, which struck Moran in the chest, causing Moran to "stumble back towards the door." As Moran was falling backwards, Cox fired a "third and fourth [shot] pretty much at the same time." Moran fell onto his back and was "having a hard time breathing." Cox directed B.M. to retrieve Moran's wallet, which required that B.M. first roll Moran over on to his stomach. After Cox went through Moran's wallet, he said, "Let's continue," which B.M. understood as a command to continue with the tour of the home.

In Moran's bedroom, Cox directed B.M. to unlock a safe and empty its contents (paperwork and ammunition) into B.M.'s school backpack. Cox then asked B.M. if he had any duct tape or rope. When B.M. said that he did not, Cox told B.M. to put his hands on his head, close his eyes, and count to 120. When B.M. finished counting to 120, Cox was gone. B.M. immediately called 911.

Upon their arrival, the police found Moran dead on the floor. They also found four .357 bullets at the scene: one on the foyer floor, one in Moran's pant leg, one under Moran's body, and one lodged in a door leading to a stairway.

The medical examiner performed an autopsy on Moran and concluded that he was shot four times: once in the right thigh and three times in the chest. One of the bullets in Moran's chest traveled in a downward trajectory, and two traveled upward from front to

5

back. The medical examiner concluded that the two bullets traveling at an upward angle were probably fired when Moran was falling backwards or already on the floor.

Witnesses from Affordable Town Car identified Kurr as a potential suspect. Investigators examined Kurr's cell phone activity, leading them to identify Cox as a suspect as well. Investigators then tracked Cox and Kurr via their cell phone activity and 4 days later arrested Cox in an alley near Moran's house. Cox was carrying B.M.'s school backpack, three .357 rounds, and Moran's cell phone.

Cox arrived at the Shakopee police department around 9:45 p.m., and was interviewed by Shakopee Detective Cody Horner and BCA Agent Mike Wold. Shakopee Detective Corey Schneck was present for the final hour of the interview. The interview began at 11:49 p.m. and lasted almost 5 hours, concluding at 4:45 a.m. Agent Wold began the interview by informing Cox of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). When asked whether he understood those rights, Cox answered, "Uh huh." Agent Wold informed Cox he was not free to leave, told him that the officers "kinda need to hear [Cox's] side of the story," and asked him if he was willing to talk. Cox answered, "Sure."

During the interview, Cox asked investigators about the status of a police investigation into the cause of his brother's death. Cox stated that his brother, T.T., suffered a gunshot wound to the left side of his head in 2011 and that his death was the reason Cox moved to Minnesota. Cox told the investigators that "they tried to deem [his death] a suicide at first and I heard forensics came back and reopened the case and then I

6

never heard anything else about the situation." Cox mentioned that he "would love to be able to [hire] private investigators," but that he did not have the money.

Later in the interview, Cox initiated a negotiation with the investigators that resulted in his confession:

> AC: I mean this is this is my only negotiation I think it's pretty fair. You know what I mean. My negotiation is this . . . I'm a go ahead and, and kill myself (Inaudible) what you say, words, right?
>
> MW: Yup
>
> AC: But in exchange I need one favor it's not a hard favor. All I need is to uhm I would like to know a little bit a information more about if anybody was checking out my brother's murder. You know what I mean, I like to know if it was you know I mean if they found out that yes this is a murder and you know I mean something.

Agent Wold agreed to "look into" the matter, and Cox subsequently admitted he killed Moran.

In December 2013, a Scott County grand jury indicted Cox on one count of first-degree premeditated murder, Minn. Stat. § 609.185, subd. (a)(1) (2014); two counts of first-degree intentional murder while committing or attempting to commit a felony, Minn. Stat. § 609.185, subd. (a)(3) (2014); and one count of first-degree aggravated robbery, Minn. Stat. § 609.245, subd. 1 (2014). Cox moved to suppress the statement he gave to police following his arrest, arguing, among other things, that it was involuntary. Following a contested omnibus hearing, the district court denied Cox's motion to suppress and his case proceeded to trial.

At trial, the State presented evidence that was consistent with the facts outlined above. On the issue of premeditation, the court instructed the jurors that:

7

Premeditation means that the defendant considered, planned, prepared for, or determined to commit the act before the defendant committed it. Premeditation, being a process of the mind is wholly subjective, and hence, not always susceptible to proof by direct evidence. It may be inferred from all the circumstances surrounding the event. It is not necessary that premeditation exist for any specific length of time. A premeditated decision to kill may be reached in a short period of time. However, *an unconsidered or rash impulse*, even though it includes an intent to kill*, is not premeditated*.[3]

(Emphasis added.) During closing argument, defense counsel argued Cox's conduct was "impulsive." The jury disagreed, finding Cox guilty of first-degree premeditated murder. Based on the jury's verdict, the district court convicted Cox of first-degree premeditated murder and sentenced him to life in prison without the possibility of release. This direct appeal followed.

## I.

Cox argues the district court committed reversible error by denying his motion to suppress his confession. Specifically, Cox alleges that (1) police promised that in exchange for his statement they would look into his brother's death; (2) police assured him they could influence the county attorney; and (3) police told him that a "small town Scott County jury" would be more lenient if presented with a full confession.

We review a district court's legal determination of whether a defendant's statement was voluntary de novo. *State v. Farnsworth*, 738 N.W.2d 364, 373 (Minn. 2007). But we accept the underlying factual determinations of the district court regarding the

---

[3] The instruction substantially mirrored the language of the standard jury instruction on premeditation. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 11.05 (6th ed. 2015).

circumstances of the interview unless the findings are clearly erroneous. *State v. Riley*, 568 N.W.2d 518, 525 (Minn. 1997).

The Due Process Clause of the Fourteenth Amendment prohibits the admission into evidence of a statement that was not voluntarily given. *See State v. Biron*, 266 Minn. 272, 281, 123 N.W.2d 392, 398 (1963). The State must establish by a preponderance of the evidence that a statement was voluntary. *Riley*, 568 N.W.2d at 525. We review the totality of the circumstances to determine whether the State met its burden to establish that a statement was voluntary. *State v. Zabawa*, 787 N.W.2d 177, 182 (Minn. 2010).

In determining whether a defendant's statement was voluntary, we consider the nature of the interview, including its length, the adequacy of warnings, whether the defendant's physical needs were met, and whether the defendant was denied access to friends. *Farnsworth*, 738 N.W.2d at 373; *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991). The ultimate question of voluntariness is, however, whether a defendant's will was overborne at the time of his confession. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *Farnsworth*, 738 N.W.2d at 373; *Riley*, 568 N.W.2d at 525. Put differently, we must determine whether the police actions, together with other circumstances surrounding an interview, were so coercive, manipulative, and overpowering that the defendant was deprived of his ability to make an independent decision to speak. *Farnsworth*, 738 N.W.2d at 373; *Pilcher*, 472 N.W.2d at 333.

A.

We first consider Cox's argument that his statement was rendered involuntary when the police promised that they would look into his brother's death in exchange for his

9

statement. As a general rule, we disfavor law enforcement making implied and express promises in the course of an interrogation. For example, in *State v. Biron* we concluded that a new trial was warranted after police officers persuaded a defendant that he might be treated as a juvenile offender rather than being exposed to the penalties of a felony murder charge. 266 Minn. at 282-83, 123 N.W.2d at 399. And in *Haynes v. Washington*, the United States Supreme Court concluded a confession was involuntary where it was induced by the express threat of "incommunicado detention" coupled with the assurance that defendant could contact his family. 373 U.S. 503, 513-514 (1963). But, a promise—real or perceived—made by law enforcement during an interrogation does not by itself render a statement involuntary; rather, it is considered in the totality of the circumstances. Thus, in *State v. Thaggard* we concluded that a statement was voluntary even though the defendant was led to believe he might receive drug treatment as a result, because the totality of the circumstances indicated he understood his rights and the gravity of the situation. 527 N.W.2d 804, 811-12 (Minn. 1995).

After reviewing the record, we conclude that this case is factually distinguishable from *Biron*. About 1 hour and 20 minutes into the interview, Cox raised the possibility of making a deal with the officers: if they promised to look into his brother's death, he would tell the officers what happened. More specifically, Cox stated that he wanted "to know a little bit a information more about [his] brother's murder," and Agent Wold indicated that he would "certainly look into that." A few moments later, Cox asked, "[D]o we have somewhat of a mutual agreement?" Agent Wold responded, "Yah . . . I will look into it." Two pages later in the transcript, Cox admitted to shooting Moran.

10

The transcript of the statement demonstrates that Cox's will was not overborne. Indeed, Cox initiated the negotiation that led to Agent Wold's agreement and Cox's inculpatory statement, which distinguishes this case from *Biron*, 266 Minn. at 282-83, 123 N.W.2d at 394. Cox's role in opening the negotiation also distances this case from *Haynes*. There, the defendant repeatedly refused to confess, and only relented after the threat of indefinite, isolated detention coupled with a promise that he could contact his family. *Haynes*, 373 U.S. at 513-14. Rather, Cox, like the defendant in *Thaggard*, "nam[ed] his own terms for confession." 527 N.W.2d at 811 ("The spectacle of [defendant] naming his own terms for confession, deciding for himself with whom he would negotiate, getting what he wanted as a consideration for telling what he knew, reduces to absurdity his present claim that he was coerced into confession." (quoting *Stein v. New York*, 346 U.S. 156, 185-86 (1953))). Moreover, the evidence indicates that Cox understood his rights and the gravity of the situation. Far from having his will overborne, we conclude that the transcript demonstrates that Cox intentionally attempted to strike a deal in return for his confession.

B.

We next consider Cox's argument that the statements of Agent Wold and Detective Horner suggesting a full confession would be viewed favorably by a prosecutor were coercive. A suggestion by the police that they can influence prosecutors in favor of a defendant is improper. When police make such questionable statements, we consider whether—taken in context—such statements amount to "psychological coercion which would render defendant's confession involuntary." *State v. Slowinski*, 450 N.W.2d 107, 112 (Minn. 1990). Further, it is permissible for officers to inform defendants of potential

11

charges to encourage them to speak. *See, e.g.*, *State v. Clark*, 738 N.W.2d 316, 335 (Minn. 2007); *State v. Merrill*, 274 N.W.2d 99, 107-08 (Minn. 1978). In *State v. Slowinski*, we concluded that police statements to the defendant that they would tell the county attorney the defendant needed psychiatric help were improper. 450 N.W.2d at 112. However, we ultimately concluded the statements in that case were not coercive. *Id.* And in *State v. Beckman*, we upheld the admission of a confession despite an officer's statement that defendant's cooperation would be brought to the district court's attention. 354 N.W.2d 432, 437 (Minn. 1984).

Cox points to several statements investigators made during his interview before he confessed as evidence of coercion. For example, police officers stated:

- I wanna know that information so that we can go and tell our bosses that tonight Anthony was very truthful . . . .

- It looks so much better that when the attorneys when they pull all of our reports together and they review your statement or review the recording of this interview tonight and they go wow here is a young man who at least said what he did he's sorry for what he did and he didn't mean it for it to go down that way and he was cooperative and filled in all of the other pieces all I can tell you Anthony is that people that do that (Inaudible) better I think everybody involved in the whole system just go wow . . . .

We conclude that the police statements Cox challenges were not improper in the context in which they were given. The officers stated that a full confession would be impressive and that defendants who make a full confession generally do better in the criminal justice system. But the officers did not promise that if Cox confessed, they would attempt to obtain favorable treatment for him from the prosecutors. Consequently, the police statements in this case are significantly different than the statements we have

12

deemed improper in the past.[4] *See Slowinski*, 450 N.W.2d at 112 (deeming improper officers' statement that led a defendant to believe he would be given psychiatric help); *Biron*, 266 Minn. at 276-80, 123 N.W.2d at 395-97 (deeming improper officers' statement that led a defendant to believe he would be tried as a juvenile).

## C.

Cox further argues his confession was rendered involuntary by the police officers' statements that Scott County juries have a "small town" outlook and are more likely to look favorably on a full confession. He suggests the officers "played on the societal fear of urban crime committed by young black men and how that [is] perceived in small towns." These statements were all made to pressure Cox into implicating Kurr, which ultimately proved fruitless. We conclude that the police statements were not unduly coercive. The statement of how a jury may view certain evidence is simply a prediction.

In sum, we conclude that the totality of the circumstances do not support Cox's argument that his confession to police was involuntary.[5] To the contrary, a review of the

---

[4]    Cox also relies on statements made *after* his confession, all of which were made in an effort to persuade Cox to inculpate Kurr. Cox's argument that these statements overwhelmed his will and caused him to incriminate himself lacks merit for two reasons. First, these statements were made by officers *after* Cox confessed to shooting Moran. And second, all of these statements were made in an effort to persuade Cox to inculpate Kurr. Thus, logically, none of the statements could have had any bearing on Cox's confession that he killed Moran.

[5]    Cox also points to other factors that he believes lead to the conclusion that his confession was involuntary. These include Cox's age, the length of the interview, the fact that he was in custody and did not initiate the interview, and the fact that he made a confession. These arguments are without merit. Cox was not a minor when he made his confession; he was 21 years old and had previous contacts with the criminal justice system.

13

relevant facts, and the transcript, reveals a discussion that cannot be characterized as hostile or coercive. Instead, Cox did not implicate Kurr in the killing of Moran during the interview despite repeated appeals from the police officers that he do so. Consequently, the district court did not commit reversible error when it denied Cox's motion to suppress his confession.

## II.

Cox challenges his conviction of first-degree premeditated murder, arguing the circumstances proved support a rational inference that he shot Moran in a rash impulse, and therefore the State presented insufficient evidence to prove the element of premeditation. Essentially, Cox admits the murder was intentional, but asserts that it was not premeditated. The question is therefore whether there is sufficient evidence to support the jury's verdict that Cox committed premeditated murder.

When the State relies entirely on circumstantial evidence to prove an element of the offense, we use a two-step test to determine whether the State presented sufficient evidence to prove the element. *State v. Anderson*, 789 N.W.2d 227, 241 (Minn. 2010); *see also State v. McAllister*, 862 N.W.2d 49, 53-55 (Minn. 2015). First, we identify the circumstances

---

Cox was presented with a *Miranda* warning, and he indicated that he understood his rights and wished to proceed with the interview. Cox concedes that he was "given access to food, water and a bathroom" during the interview, that the tone of the interview was "not on balance hostile," and that those factors ought to be considered when assessing whether his subsequent statement was voluntary. Cox's argument that the interview was overlong is misleading because while it lasted nearly 5 hours, he confessed after less than an hour and a half. *See Clark*, 738 N.W.2d at 330, 333 (stating a 2-hour interview is fairly short).

14

proved and, in doing so, defer to the fact-finder's acceptance of the proof of these circumstances and rejection of conflicting evidence. *State v. Silvernail*, 831 N.W.2d 594, 598-99 (Minn. 2013). Second, we examine the reasonable inferences that can be drawn from the circumstances proved. *State v. Matthews*, 800 N.W.2d 629, 636 (Minn. 2011). We give no deference to the fact-finder's choice between reasonable inferences. *Id.*

To sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt. *State v. Andersen*, 784 N.W.2d 320, 332 (Minn. 2010) (citing *State v. Curtis*, 295 N.W.2d 253, 258 (Minn. 1980)). When applying this test, we view the circumstances proved as a whole and not as discrete and isolated facts. *Matthews*, 800 N.W.2d at 635-36; *see also State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011). We will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture. *State v. Lahue*, 585 N.W.2d 785, 789 (Minn. 1998).

A person who "causes the death of a human being with intent to effect the death of that person or another, but without premeditation" is guilty of second-degree murder. Minn. Stat. § 609.19, subd. 1(1) (2014). In contrast, a person who "causes the death of a human being with premeditation and with intent to effect the death of the person or of another" is guilty of first-degree premeditated murder. Minn. Stat. § 609.185, subd. (a)(1).

"Premeditation" means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2014). Premeditation does not require proof of extensive planning or preparation, nor does it demand that a

15

specific time period elapse for deliberation. *State v. Cooper*, 561 N.W.2d 175, 180 (Minn. 1997). Instead, the State must simply establish that there was *some* appreciable passage of time between a defendant's formation of the intent to kill and the act of killing, and that during this time defendant deliberated about the act. *State v. Leake*, 699 N.W.2d 312, 319 (Minn. 2005). Premeditation is a state of mind "generally proven through circumstantial evidence." *State v. Hughes*, 749 N.W.2d 307, 312 (Minn. 2008) (quoting *Leake*, 699 N.W.2d at 319).

We have previously observed that an inference of premeditation may be supported by several categories of evidence, including planning activity, motive, the nature of the killing, and a defendant's actions following the killing. *State v. Barshaw*, 879 N.W.2d 356, 363 (Minn. 2016) (identifying planning activity, motive, and the nature of the killing as relevant to premeditation); *State v. Moore*, 846 N.W.2d 83, 89 (Minn. 2014) (same); *Leake*, 699 N.W.2d at 321 (identifying the defendant's actions before and after the murder as relevant to premeditation). While evidence of motive is relevant, it is unnecessary to a finding of premeditation. *Palmer*, 803 N.W.2d at 735. Because the State does not discuss motive on appeal, our analysis focuses on Cox's planning activity, the nature of the killing, and Cox's actions following the killing. We consider each of these categories in turn.

A.

Planning activity relates to "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." *Hughes*, 749 N.W.2d at 313 (quoting *Moore*, 481 N.W.2d at 361). Planning activity can consist of "prior possession of the murder weapon by the defendant." *Palmer*, 803 N.W.2d at 734

16

(quoting *Hughes*, 749 N.W.2d at 313). We have observed that "arming oneself prior to a robbery expecting to kill if need be anyone obstructing the plans would be sufficient to come within the definition [of premeditation] even though it may be hoped and anticipated that the need for killing would not occur." *State v. Kirch*, 322 N.W.2d 770, 773 (Minn. 1982) (quoting Minn. Stat. Ann. § 609.18 (West 1964) (advisory comm. cmt.)). Although we have never discussed whether putting a pistol grip glove on one's trigger hand supports a finding of premeditation, the California Court of Appeal has said "the fact defendant wore a glove on one hand, his shooting hand, support[s] a reasonable inference defendant killed as a result of deliberation and premeditation" because "[w]earing the one glove shows defendant intended to use the gun." *People v. Diaz*, No. G046207, 2013 WL 286275, at *4 (Cal. Ct. App. Jan. 25, 2013). While *Diaz* does not provide controlling legal precedent, we find its reasoning persuasive. A person who does not intend to fire a gun has no need to wear a specialized glove that improves performance and cushions the shooting hand.

The circumstances proved regarding Cox's planning activity are as follows. Kurr and Cox planned the armed robbery of Moran's home because Kurr believed that Moran was the reason Kurr was fired from his job, and that Moran had money and drugs at his home. Before the robbery, Cox armed himself with a fully loaded .357 magnum handgun and placed extra bullets in his pocket. He wore a pistol grip glove on his shooting hand, and a mismatched cotton glove on his other hand. Prior to the night of the shooting, Cox practiced shooting the handgun. While he awaited Moran's arrival, Cox told B.M. he might

17

"just kill everybody" if B.M. was lying to him. When Moran arrived, Cox said, "This is the one I'm looking for."

The circumstances proved, as a whole, support a rational inference that Cox premeditated the murder of Moran. It is reasonable to infer that Cox planned an armed robbery and killing if necessary to accomplish his criminal objective. Like the defendant in *Kirch*, 322 N.W.2d at 773, Cox armed himself with a handgun in anticipation that the robbery might require him to use it against the occupants of Moran's home. Cox practiced shooting the handgun so that he would be prepared to shoot the occupants of the home. Cox also wore a pistol grip glove designed to cushion a person's hand *when a gun is fired* and placed additional bullets in his pocket, both of which support an inference that he contemplated firing the gun before he entered Moran's home. Further, even before Moran arrived, Cox told B.M. that he might kill everybody in the home. When Moran arrived, Cox identified him as "the one" he was looking for, which supports a reasonable inference that Cox did not simply intend to steal items from Moran's home but instead intended to rob Moran at gunpoint and, if necessary, kill Moran to accomplish his criminal objective.

Moreover, these circumstances are inconsistent with a rational inference that Cox's killing of Moran was the product of a rash impulse. It is true that the circumstances proved support a rational inference that Cox's initial criminal objective might not have been kill Moran, but rather to rob Moran at gunpoint. Cox's plan plainly focused on the armed robbery of Moran. But it is unreasonable to infer that Cox did not plan to kill the individuals in the home if necessary to accomplish this initial criminal objective. We therefore conclude that the circumstances proved as a whole regarding Cox's planning

18

activity are consistent with a rational inference that Cox considered killing Moran ahead of time and inconsistent with a rational inference that Cox's murder of Moran was a rash impulse.

B.

We next turn to the nature of the killing. Previously, we have concluded that evidence of even a short pause between shots may support an inference of premeditation. *State v. Buchanan*, 431 N.W.2d 542, 548 (Minn. 1988) ("[W]here first shots are followed by a pause and second shots, an inference of premeditation is proper."). Also, evidence showing that the defendant inflicted wounds to the victim's vital organs may support an inference of premeditation. *State v. Ortega*, 813 N.W.2d 86, 101 (Minn. 2012). Moreover, the fact that the defendant fired additional shots from a handgun after the victim was incapacitated may support an inference of premeditation. *See Palmer*, 803 N.W.2d at 736-37 (reasoning evidence showing that the defendant "stood over [the victim] and finished him off," including the downward trajectories of some of the bullets, supported the jury's finding of premeditation); *State v. Clark*, 739 N.W.2d 412, 423 (Minn. 2007) (reasoning evidence showing that the fatal second wound was inflicted while the victim was lying on the floor supported the jury's finding of premeditation).

The circumstances proved regarding the nature of Cox's killing of Moran are that Moran walked in the front door and Cox, who was standing across the room from him, raised the .357 magnum from his side and aimed it at Moran. Surprised by Cox's presence, Moran said, "Whoa." Looking back and forth between Cox and B.M, Moran smiled, apparently believing that Cox's presence was some kind of joke. Upon Moran's arrival,

19

Cox *did not* immediately shoot Moran four times in rapid succession. Cox also did not tell Moran that this was a robbery or demand any cash or drugs. Instead, Cox focused upon Moran by saying, "This is the one I'm looking for." Moran's cell phone began to ring. In spite of Cox's order to show his hands, Moran reached into his pocket and pulled the phone out of his pocket. B.M. could see that the object in Moran's hand was a phone. Cox ordered Moran to "put down the phone." When Moran ignored that order, Cox shot Moran in the right thigh, shattering his femur. B.M. turned away and covered his ears. Forty seconds elapsed between the first order and the first shot. After the first shot, Cox offered Moran another opportunity to comply with his orders. When Moran continued to ignore him, Cox fired a second shot that struck Moran in the chest, causing Moran to "stumble back towards the door." As Moran fell backwards, Cox fired a "third and fourth [shot] pretty much at the same time."

The circumstances proved, when considered as a whole, support a rational inference that Cox premeditated the murder of Moran. Cox paused between the first, second, and third shots. *See Buchanan*, 431 N.W.2d at 548. The first shot incapacitated Moran when it shattered his femur. *See Palmer*, 803 N.W.2d at 736-37. The remaining shots struck Moran in the chest, damaging vital organs. *See Ortega*, 813 N.W.2d at 101. Cox used a .357 magnum to kill Moran, a semiautomatic weapon that fires one bullet per pull of the trigger. These circumstances are all consistent with a rational inference of premeditation and inconsistent with a rational inference that Cox shot Moran in a rash impulse.

20

C.

We also consider a defendant's actions following a killing when determining whether there was premeditation. *See Leake*, 699 N.W.2d at 321; *Kirch*, 322 N.W.2d at 774. Removing valuables from the body after killing the victim is considered evidence of premeditation. *See Pilcher*, 472 N.W.2d at 336. The failure to administer any aid to a victim who does not die instantaneously also supports an inference of premeditation. *See Anderson*, 789 N.W.2d at 242-43. And laughter following a murder is "inconsistent with having acted on a rash impulse that arguably should lead to quick regret." *State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000) (internal quotation marks omitted).

The circumstances proved regarding Cox's actions after he shot Moran include the following. The first words Cox uttered after he stopped shooting were, "Now I only have two [bullets] left." Cox made B.M. roll Moran over and retrieve Moran's wallet from his pocket. Cox made no effort to aid Moran. Instead, after examining the contents of Moran's wallet, Cox said, "Let's continue," which B.M. understood as a command to continue the tour of the home. Before he left, Cox asked B.M. if he had any duct tape or rope. When B.M. said he didn't have any, Cox told him to put his hands on his head and count to 120. Later that night, Cox was laughing and showing his gun to others in a Minneapolis recording studio. On the following day, Cox laughed when Kurr discovered Moran was dead, and said, "I always wanted to kill a white boy ever since a white boy killed my brother."

The circumstances proved, when taken as a whole, support a rational inference that Cox premeditated the murder of Moran. As Moran lay on the ground struggling to breathe,

21

Cox stole his wallet. *See Pilcher*, 472 N.W.2d at 336. Cox failed to render aid to Moran and considered restraining B.M. with duct tape or rope, which would have prevented B.M. from calling 911 to obtain emergency assistance for Moran. *See Anderson*, 789 N.W.2d at 242-43. Cox laughed when Kurr discovered Moran was dead, and said "I always wanted to kill a white boy ever since a white boy killed my brother." *See Johnson*, 616 N.W.2d at 726. These circumstances, when viewed as a whole, are consistent with a rational inference of premeditation and inconsistent with a rational inference that Cox shot Moran in a rash impulse.

Cox and the dissent separately analyze and parse each fact to argue the murder was the product of a rash impulse and not premeditated. This argument is flawed. Our circumstantial evidence standard requires that we examine the circumstances proved as a whole and not piecemeal. *Matthews*, 800 N.W.2d at 635-36. Here, the circumstances proved, examined as a whole, support a reasonable inference that Cox premeditated the murder of Moran and are inconsistent with a reasonable inference that his conduct was the result of a rash impulse.[6]

---

[6] The circumstances proved taken together are as follows. Cox planned the armed robbery of Moran's home, including the potential murder of those he encountered, to accomplish his criminal objective. Cox practiced shooting the handgun, and brought a fully loaded handgun, extra bullets, and a shooting glove with him so that he was ready to murder the occupants of the home if necessary. Cox unlawfully entered Moran's home, and told B.M. that he might kill everyone in the home if B.M. lied to him. When Moran arrived Cox stated that Moran is "the one I'm looking for." Moran's cell phone rang and Cox ordered Moran to show his hands. When Moran ignored Cox's command to "put down the phone," Cox shot Moran in the leg shattering his femur. Forty seconds elapsed between the first command and the first shot. Moran was wounded and unarmed. When Moran ignored the second command, Cox shot Moran in the chest causing him to stumble and fall. Cox shot Moran in the chest two more times.

III.

In sum, the district court did not commit reversible error when it denied Cox's motion to suppress, because the totality of the circumstances do not support Cox's argument that his confession to police was involuntary. In addition, the circumstances proved regarding Cox's planning activity, the nature of the killing, and Cox's actions following the murder, examined as a whole, are consistent with a rational inference that Cox premediated the murder and inconsistent with Cox's argument that his murder of Moran was the product of a rash impulse.

Affirmed.

CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

D I S S E N T

ANDERSON, Justice (dissenting).

It is undisputed that appellant Anthony Cox murdered Aaron Moran.[1] The question presented to our court is whether Cox premeditated the murder. I conclude that, by upholding the conviction of Cox for first-degree premeditated murder, the court has further blurred the already amorphous line between intentional murder and premeditated murder.

The Legislature chose to distinguish between intentional murders and premeditated murders. Because the court's opinion erodes this distinction, and because the circumstances proved in this brutal killing are equally consistent with an intentional, but not premeditated murder, I respectfully dissent.

I.

On October 8, 2013, Cox and a friend, Brooks Kurr, planned to rob Moran at his home in Shakopee. Although Cox did not know Moran, Kurr knew Moran well and knew that Moran often carried cash. Kurr drove Cox to Moran's neighborhood and parked the car a few blocks from Moran's home. Kurr gave Cox a .38 caliber handgun "for intimidation purposes and, . . . if necessary, force" and sent Cox to complete the robbery while Kurr waited in the vehicle. Cox walked toward Moran's home, but he became lost, was unable to locate the home, and abandoned the robbery attempt.

---

[1] I join in Part I of the court's opinion regarding the admissibility of appellant's statement to the police.

D-1

Kurr and Cox returned to Moran's neighborhood 2 weeks later, on October 22. The plan for the robbery was identical to October 8. On this occasion, however, Cox brought a .357 magnum handgun, which he had purchased sometime between October 8 and October 22, and extra ammunition for the handgun. Cox wore a cotton glove on his left hand and a "pistol grip-type glove" on his right hand.

Cox entered Moran's home through the front door, encountered Moran's then-15-year-old-nephew B.M., and announced that "this is a robbery." Cox closed the curtains and asked B.M. whether there was anyone else in the home. B.M. responded by asking whether a Town Car was parked in the driveway. When Cox indicated that there was no Town Car in the driveway, B.M. told Cox that no one else was in the home. Cox then said, "If there [is] someone in the house it be ok if I just killed everybody . . . ." Cox then told B.M. to take him on a tour of the home.

About this time, Moran walked into the home through the front door. Moran saw Cox, who pointed the .357 magnum at Moran. Cox said, "This is the one I'm looking for." Just then, Moran's cell phone began to ring. Moran reached for the phone and Cox ordered him to show his hands. Moran ignored Cox's orders and pulled the phone completely out of his pocket. Cox ordered Moran to put the phone down. Moran again ignored the order and Cox shot Moran in the right thigh. The shot shattered Moran's femur.

B.M. turned away and covered his ears. According to B.M., a total of 40 seconds elapsed between the first time Cox ordered Moran to show his hands and the first shot. Cox later told police that, after the first shot, he gave Moran another opportunity to comply with his order to put down the phone. Moran continued to ignore Cox's commands and

Cox shot him again, this time in the chest. Moran stumbled back toward the door and Cox fired two more shots in rapid succession, causing Moran to fall on his back.

Cox directed B.M. to retrieve Moran's wallet. After going through the wallet, Cox directed B.M. to continue with the tour of the home. Cox followed B.M. throughout the home, taking various items along the way. Cox then asked B.M. whether he had any duct tape or rope, and B.M. indicated that he did not. Cox then instructed B.M. to put his hands on his head, close his eyes, and count to 120. When B.M. finished counting, Cox was gone and B.M. immediately called 911. Police responded to the scene and found Moran dead on the floor.

Kurr testified that after he picked up Cox, Cox informed him that he had shot Moran in the leg. Later that night, Cox was seen laughing and showing off his gun. The following day, Kurr and Cox learned that Moran had died and Cox laughed and said: "I always wanted to kill a white boy ever since a white boy killed my brother."

A short time after Moran's death, investigators identified Kurr as a suspect. Based on Kurr's relationship with Cox, the authorities also identified Cox as a suspect. On October 26, 2013, Cox was arrested in an alley near Moran's house carrying B.M.'s backpack, three .357 rounds, and Moran's cell phone. When he was interviewed by police, Cox admitted shooting Moran and gave an account of events that largely tracked B.M.'s testimony.

In December 2013, a Scott County grand jury indicted Cox on charges of first-degree premeditated murder, first-degree felony intentional murder, and first-degree aggravated robbery. A jury found Cox guilty of all counts. The district court convicted

Cox of first-degree premeditated murder and sentenced him to life in prison without the possibility of release.

On direct appeal to our court, Cox argues that his conviction should be reversed on two grounds. First, Cox argues that his statement to police was involuntary and therefore improperly admitted at trial. I join Part I of the court's opinion denying Cox's claims regarding his statement to police. Second, Cox argues that there was insufficient evidence to support his conviction for first-degree premeditated murder. Because the evidence presented by the State is insufficient to support a finding of premeditation, I respectfully dissent.

## II.

In Minnesota, the crimes of intentional murder and premeditated murder are distinct.[2] The crime of second-degree intentional murder is committed when a defendant "causes the death of a human being with intent to effect the death of that person or another, but without premeditation." Minn. Stat. § 609.19, subd. 1(1) (2014). First-degree premeditated murder, on the other hand, is committed when a defendant "causes the death

---

[2]    English common law did not differentiate between what we now call first-degree and second-degree murders. *See* Thomas A. Green, *The Jury and the English Law of Homicide, 1200-1600*, 74 Mich. L. Rev. 413, 417-21 (1975-76). All unjustified or inexcusable killings were felonious murders and all felonious murders were punishable by death. *Id.* In 1682 and 1683, at the insistence of William Penn, Pennsylvania became the first colony to formally distinguish between premeditated murders and other killings. *See* Matthew A. Pauley, *Murder by Premeditation*, 36 Am. Crim. L. Rev. 145, 145-46 (1999). Most states, including Minnesota, generally followed Pennsylvania's formulation. *See id.*; *see also* Minn. Gen. Stat. ch. 89, § 2 (1858) ("Such killing when perpetrated with a premeditated design to effect the death of a person killed, or any human being, shall be murder in the first degree . . . .").

of a human being with premeditation and with intent to effect the death of the person."
Minn. Stat. § 609.185(a)(1) (2014).

The sole difference between first-degree premeditated murder and second-degree intentional murder is the element of premeditation, which is defined as "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2014). Yet the Legislature created two separate crimes and attached substantially different sentences to those two crimes. *Compare* Minn. Stat. § 609.185(a) (2014) (stating that anyone found guilty of first-degree murder "shall be sentenced to imprisonment for life"), *with* Minn. Stat. § 609.19, subd. 1 (2014) (stating that an individual found guilty of second-degree intentional murder "may be sentenced to imprisonment for not more than 40 years").[3] Thus, it is imperative that we give effect to the clear intent of

---

[3] From 1858 until 1911, Minnesota imposed the death sentence on defendants convicted of first-degree premeditated murder. *See* Minn. Gen. Stat. ch. 89, § 2 (1858) (providing that anyone convicted of first-degree premeditated murder "shall suffer the penalty of death"); Minn. Rev. Laws ch. 97, § 4876 (1905) (providing that first-degree premeditated murder "shall be punished by death"). In 1911, however, the law was amended and defendants convicted of first-degree premeditated murder were subject to the sentence of life in prison. Act of April 22, 1911, ch. 387, § 1, 1911 Minn. Laws 572, 572 (changing the punishment for first-degree premediated murder to "imprisonment for life"). Between 1911 and 2005, defendants convicted of first-degree premeditated murder were sentenced to life in prison, but were eligible for parole after 20 to 35 years in prison, depending on the timing of the offense and the defendant's conduct in prison. *See, e.g.*, Minn. Rev. Laws ch. 105, § 5452 (1905) ("The state board of control may parole any prisoner: Provided . . . [n]o convict serving a life sentence shall be paroled until he has served thirty-five years, less the diminution which would have been allowed for good conduct had his sentence been for thirty-five years . . . ."). In 2005, the Legislature increased the penalty for first-degree premeditated murder by imposing the sentence of life without the possibility of release on all defendants convicted of first-degree premeditated murder. *See* Act of May 31, 2005, ch. 136, art. 2, § 5, 2005 Minn. Laws 901, 922 (codified at Minn. Stat. § 609.106 (2014)).

the Legislature to differentiate between murders that are premeditated—that is, considered, planned, and prepared for—and murders that are intentional, but not premeditated.

"This court, and many other courts, have struggled to give effect to the distinction between" a premeditated murder and an intentional murder. *State v. Moore*, 481 N.W.2d 355, 360 (Minn. 1992). At one time, our court held that premeditation may occur "instantaneously" and almost simultaneously with the intent to kill. *See State v. Neumann*, 262 N.W.2d 426, 430 (Minn. 1978). But we later recognized that this rule impermissibly blurred the line between first-degree murder and second-degree murder. *Moore*, 481 N.W.2d at 360-61. Consequently, we now require that "some appreciable time" pass between the moment the defendant forms the intent to kill and the time the actual murder occurs for there to be premeditation. *Id.*

Similarly, we have previously inferred "premeditation solely from the number of times a weapon is used." *State v. Lloyd*, 345 N.W.2d 240, 245 (Minn. 1984) (citing *State v. Hare*, 278 Minn. 405, 408, 154 N.W.2d 820, 822 (1967)). Once again, however, we recognized that this rule inappropriately broadened the scope of premeditated murder and reversed course. Now, although the number of times a weapon is used is considered relevant to the issue of premeditation, the number of wounds inflicted cannot, by itself, support an inference of premeditation. *Id.*

These course corrections are only a small sampling of the struggles we have faced when attempting to maintain the distinction between a premeditated murder and an intentional murder. Over the years, we have developed a complex and nuanced framework for determining whether a jury's finding of premeditation is justified. "We consider three

categories of evidence relevant to an inference of premeditation: planning activity, motive, and the nature of the killing." *State v. Yang*, 774 N.W.2d 539, 560 (Minn. 2009). The defendant's conduct after the killing also can be relevant when determining whether the killing was premeditated. *See State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000).

"Premeditation is a state of mind and, thus, generally proven through circumstantial evidence." *State v. Leake*, 699 N.W.2d 312, 319 (Minn. 2005). When, as in this case, the conviction is based on circumstantial evidence, it "warrants particular scrutiny." *State v. Bolstad*, 686 N.W.2d 531, 539 (Minn. 2004). Nonetheless, "circumstantial evidence in a criminal case is entitled to as much weight as any other type of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational or reasonable hypothesis except for that of guilt." *State v. Wallace*, 558 N.W.2d 469, 472 (Minn. 1997).

We apply a two-step test to determine whether circumstantial evidence supports the conviction:

> First, we must identify the circumstances proved, giving deference to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State. Second, we independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt. Thus, our review consists of determining whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt.

*State v. Anderson*, 789 N.W.2d 227, 241-42 (Minn. 2010) (citation omitted) (internal quotation marks omitted). When applying this test, "we view the evidence as a whole, not as discrete and isolated facts." *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011). But

" 'if any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises.' " *State v. Al-Naseer*, 788 N.W.2d 469, 474 (Minn. 2010) (quoting *State v. Andersen*, 784 N.W.2d 320, 338 (Minn. 2010) (Meyer, J., concurring)).

There is no dispute that Cox intentionally killed Moran. Cox argues, however, that he killed Moran as part of a rash impulse, not a premeditated act. As a result, the relevant inquiry is whether the circumstances proved by the state are consistent with the conclusion that Cox premeditated the killing and inconsistent with any other rational hypothesis. I address the circumstances proved in turn.

### A.

"Planning activity includes 'facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing.' " *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quoting *State v. Hughes*, 749 N.W.2d 307, 313 (Minn. 2008)). The court's opinion identifies several facts as circumstances proved that are relevant to Cox's planning activity. Although each of the circumstances identified by the court could be consistent with a finding of premeditation, each circumstance identified is also consistent with a killing that was intentional, but not premeditated.

First, the court cites the fact that Cox armed himself with a handgun prior to the robbery. The court accurately notes that we have previously held that "prior possession of a murder weapon can be considered planning activity." *See Palmer*, 803 N.W.2d at 734. It is undeniably true that the prior possession of the murder weapon can, under certain circumstances, point unerringly toward premeditation. But that can only be true when there

is not another, reasonable explanation for the defendant to have prior possession of the murder weapon.

In *State v. Andersen*, for instance, the defendant argued that taking a rifle into the woods could not be used as a basis for premeditation because it was common for residents in the area to take firearms into the woods. 784 N.W.2d 320, 332 (Minn. 2010). As a result, we looked to other evidence that indicated premeditation, such as the defendant's isolation of the victim and laying in wait for him. *Id.* In *Palmer*, which the majority cites for this proposition, the defendant took a handgun with him to help collect a drug debt, raising the possibility that he brought the gun for a reason other than a premeditated killing. *See* 803 N.W.2d at 730-31. But the defendant also wiped the cartridges with which he loaded the handgun to remove his fingerprints, demonstrating that he was already contemplating using the handgun in an illegal manner. *Id*. at 731, 735. These cases illustrate that we must look for other evidence of premeditation when a defendant may have had a reason to possess the murder weapon that is consistent with a hypothesis other than premeditated murder.

In this case, Cox had a reason to possess the firearm other than committing a premeditated murder. Specifically, Cox was armed in order to facilitate the commission of an armed robbery through "intimidation purposes and, . . . if necessary, force." The court notes that arming oneself for a robbery can be indicative of premeditation if the

defendant has determined to kill anyone who impedes his progress.[4]  But Cox's actions during the robbery are inconsistent with a defendant who had predetermined to kill anyone who interfered with his robbery.

Rather than simply killing Moran at the first sign of resistance, Cox first shot Moran in the leg and again ordered him to put down his phone.  It was only after Moran did not cooperate with Cox a second time that Cox shot Moran in the chest.  In other words, Cox's first inclination was to use the handgun to intimidate Moran or force him to comply, not to kill.

Although the fact that Cox possessed the handgun is consistent with premeditation, it is also consistent with the conclusion that Cox armed himself before the robbery for the purpose of facilitating the robbery through intimidation or nonlethal force.  A rule declaring that possessing a weapon during a robbery is always indicative of a premeditated intent to kill is inconsistent with our framework for evaluating evidence of premeditation.[5]  Simply put, the fact that Cox possessed the murder weapon before the killing does not exclusively

---

[4]    The court cites our opinion in *State v. Kirch*, 322 N.W.2d 770 (Minn. 1982), for this proposition.  But *Kirch* did not involve a defendant arming himself in preparation for a robbery.  In fact, *Kirch* concerned a standoff with police that resulted in the defendant shooting a police officer who entered the defendant's trailer home.  *Id.* at 771-72.  The statement in *Kirch* regarding arming oneself for a robbery is mere dicta and is based on the advisory committee's comments to Minn. Stat. § 609.18 (1964).  *See Kirch*, 322 N.W.2d at 773.

[5]    Additionally, such a rule would render portions of the first-degree felony-murder law essentially irrelevant.  *See* Minn. Stat. § 609.185(a)(3) (stating that a defendant commits first-degree murder when the defendant intentionally causes the death of another person "while committing or attempting to commit . . . aggravated robbery").

support a finding of premeditation—it is also consistent with the hypothesis that Cox premeditated only an armed robbery.

Second, the court notes that Cox wore a special glove on his right hand. The court readily admits that we have never held that wearing a "pistol grip" glove is evidence of premeditation. Nonetheless, the court concludes that the glove supports a finding of premeditation. The presence of the glove is of limited relevance at best. The court also notes that Cox had used his handgun at a shooting range. It is just as likely that Cox used the special glove at the shooting range and wore it on the day of the murder simply because he had his handgun with him, giving little if any thought to putting on the glove. Indeed, it would be just as easy to say that a hypothetical defendant clearly premeditated a murder because he wore running shoes to make a successful escape. The presence of the glove is no more proof of premeditation than the gun itself; put another way, the glove is as much a part of the armed robbery and planned intimidation as the gun and proves little, if anything, about premeditation.

Finally, the court's opinion highlights two statements Cox made during the incident. First, Cox commented to B.M. that Cox "might just kill everybody" if B.M. was lying about being alone in the home. Although this threat would be consistent with a finding of premeditation, it is simultaneously consistent with attempting to complete an armed robbery through threats and intimidation. Nothing about Cox's statement points exclusively toward a premeditated killing. Indeed, Cox's subsequent actions—namely, that he did not kill Moran on sight nor at any point kill or attempt to kill B.M.—indicate that the threat was mere puffery in the course of the robbery.

D-11

The court makes much of Cox's statement, upon seeing Moran, that "this is the one I'm looking for." According to the court, this statement shows that Cox had focused his attention on Moran. But this proves nothing. Of course Cox's focus was on Moran. Cox came to Moran's house for the express purpose of robbing Moran. In fact, Kurr and Cox selected Moran specifically because Moran was known to carry cash. That Cox was focused on Moran does not demonstrate that Cox premeditated the killing of Moran; it merely establishes that Cox premeditated the armed robbery of Moran.

None of the alleged planning activity that the court identifies points exclusively and persuasively toward a finding of premeditation. That Cox possessed the murder weapon prior to the killing may be consistent with a finding of premeditation, but it is also consistent with the theory that he possessed the handgun to facilitate the armed robbery and without intending to shoot or even kill Moran or anyone else. The presence of a special glove, although perhaps superficially interesting, does not persuasively indicate premeditation to kill. Finally, Cox made statements that would be consistent with a finding of premeditation, but those statements are equally consistent with the hypothesis that he was simply attempting to complete the armed robbery.

B.

The court does not rely on any evidence regarding motive for the shooting. Motive evidence is not necessary to sustain a finding of premeditation, but it can help strengthen the conclusion that the defendant considered the killing in advance. *Palmer*, 803 N.W.2d at 735. The absence of motive evidence is striking in this case. Simply put, Cox had no motive to kill Moran, a stranger to him, until he became frustrated with Moran because

D-12

Moran was not complying with Cox's demands. This absence of motive, although not dispositive, is indicative of a rash and impulsive killing, not a premeditated killing.

C.

Next, we must examine the circumstances proved regarding the nature of the killing. The court identifies three main facts regarding the actual killing that support a finding of premeditation. First, the court notes that Cox paused between shots. Second, the court relies on the fact that Cox shot Moran several times after Moran had been "incapacitated." Finally, the court states that Cox shot Moran in the chest, indicating an intent to hit Moran's vital organs.

The court notes that Cox paused between shooting Moran in the leg and then shooting him three times in the chest. The court emphasizes that a short pause between shots can support a finding of premeditation. And we have previously held that a short pause between shots could support an inference of premeditation. *See State v. Buchanan*, 431 N.W.2d 542, 548 (Minn. 1988); *State v. Richardson*, 393 N.W.2d 657, 664 (Minn. 1986); *Lloyd*, 345 N.W.2d at 246. But our case law provides less than robust support for this inference. Each of the cases that forms the bedrock for the inference was decided before our decision in *Moore*, which clarified that "some appreciable time" must pass between the formation of the intent to kill and the actual killing in order to sustain a finding of premeditation. 481 N.W.2d at 361. Our decision in *Lloyd* was the source of the idea that a pause between shots is indicative of premeditation. The *Lloyd* opinion relied heavily on the notion that premeditation can occur "instantaneously" in order to reach its

D-13

conclusion and was closely linked with the concept of premeditation, which we expressly rejected in *Moore*. *See Lloyd*, 345 N.W.2d at 246.

It is true that no set amount of time is necessary for premeditation. *State v. Hughes*, 749 N.W.2d 307, 312 (Minn. 2008). But the idea that a pause of mere moments between shots is sufficient to support a finding of premeditation is inconsistent with the holding in *Moore* that "some appreciable time" must pass between the formation of the intent to kill and the actual killing. Cox shot Moran in the leg, then paused and gave Moran another chance to comply with his directions. When Moran continued to ignore Cox's directions, Cox fired the gun three more times, fatally wounding Moran. By relying on the short pause between the nonfatal and fatal shots, the court suggests that Cox premeditated Moran's killing in the span of mere seconds during which he again told Moran to put down the phone.

To hold that a pause of mere seconds between one shot and the next is consistent with premeditation and inconsistent with any other hypothesis undermines the holding of *Moore* and, again, blurs the line between a premeditated murder and an intentional murder. Regardless of whether premeditation may be inferred from a short pause between shots, an issue we need not resolve here to conclude that the evidence of premeditation is insufficient, Cox's actions are just as consistent with the theory that he acted on a rash impulse as he became frustrated with Moran's refusal to put down the phone. As a result, the pause between shots is not consistent only with a finding of premeditation and inconsistent with all other possible theories.

Next, the court states that premeditation can be inferred from the fact that Cox fired additional rounds after Moran was "incapacitated." To support this conclusion, the court again cites *Palmer*. But *Palmer* is distinguishable. In *Palmer*, the defendant shot the victim, who fell to the ground. *See* 803 N.W.2d at 732. The defendant then walked over to the victim, stood over the victim, and "finished him off." *Id.* Cox's actions here bear little resemblance to the facts found in *Palmer*.

In fact, it is not clear that Moran was even "incapacitated" by the first shot. It is true that the shot broke his leg, but Moran continued to hold on to his phone and refused to comply with Cox's direction to put down the phone. As a result, from the perspective of Cox, Moran was not incapacitated. The actions Cox took are just as consistent with the hypothesis that he shot Moran on a rash impulse because Moran was ignoring Cox.

The court also relies on the fact that Cox shot Moran in the chest, which contains vital organs. The placement of the wounds on a victim can be indicative of premeditation. *See Ortega*, 813 N.W.2d at 101. The fact that Cox shot Moran in the chest is consistent with a finding of premeditation. Once again, however, it is equally consistent with the theory that Cox killed Moran intentionally, as part of a rash impulse. None of the circumstances proved regarding the nature of the killing is consistent with a finding of premeditation and inconsistent with all other theories. As a result, the nature of the killing does not support a finding that Cox acted with premeditation.

## D.

Finally, we consider the defendant's actions following the killing. *See Johnson*, 616 N.W.2d at 726. The court identifies four circumstances proved regarding Cox's actions

after the killing. First, the court relies on the fact that Cox took Moran's wallet after the shooting. *See State v. Pilcher*, 472 N.W.2d 327, 336 (Minn. 1991). It is true that, under certain circumstances, looting the body of the victim can be considered evidence of premeditation. *See id.* In this case, however, taking Moran's wallet was equally consistent with the theory that Cox shot Moran impulsively as part of an armed robbery, which he then continued to carry out. Thus, the fact that Cox took Moran's wallet does not exclusively support a finding that the killing was premeditated.

Second, the court identifies several circumstances related to the fact that Cox did not render aid to Moran and instead continued with the robbery. A failure to render aid can be consistent with a finding of premeditation. *See Hughes*, 749 N.W.2d at 315. But in this case, Cox failed to render aid because he was continuing with the preplanned armed robbery. Cox's failure to render aid, although reprehensible, is not exclusively consistent with a premeditated murder; his failure to render aid is just as consistent with the theory that he merely wanted to complete the robbery that he originally set out to commit.

Third, the court relies on wittness testimony that, on the night of the killing, Cox was seen laughing. We have previously stated that laughter in the aftermath of a killing is inconsistent with the theory that the defendant acted on a rash impulse. *See Johnson*, 616 N.W.2d at 726-27. In *Johnson*, however, the defendant was seen laughing as he ran away from the scene. *Id.* The testimony here indicated that Cox was seen laughing hours after the murder occurred. Additionally, as the court notes later in its opinion, Cox did not learn that Moran had died until the next day. Although Cox's actions are, again, reprehensible, the fact that he was seen laughing hours after the murder and before he even knew that

Moran had died is, at best, marginally relevant to the question of whether Cox premeditated Moran's killing.

Finally, the court relies on a statement that Cox made to Kurr the day after the killing. When Cox and Kurr heard that Moran had died, Cox said, "I always wanted to kill a white boy ever since a white boy killed my brother." Even the court's opinion, though, places limited weight on this statement. Although the statement is shocking, to say the least, it is also not particularly probative of Cox's state of mind before and during the shooting, and is certainly not enough to indicate that Cox acted with premeditation. In summary, none of the circumstances proved regarding Cox's actions after the killing points exclusively to a finding of premeditation.

## III.

Many of the circumstances proved in this cruel killing of Moran by Cox could be considered consistent with a premeditated murder. If that was all that was necessary to sustain the verdict, it would be easy to affirm the conviction. The problem, however, is that the circumstances proved are also consistent with the theory that Cox murdered Moran as part of a rash impulse in the course of a robbery.

The court's holding in this case will make a premeditated murder out of virtually any armed robbery that results in a death. More generally, an affirmance here of the premeditated murder conviction may leave few circumstances that fit the statutory definition of intentional murder. Given the legislative decision to distinguish between an intentional murder and a premeditated murder, that cannot be the law. The circumstances as a whole in this case are not consistent only with the theory of a premeditated murder and

inconsistent with all other rational theories. As a result, I would vacate the conviction for first-degree premeditated murder and remand this case to the district court for further proceedings.


GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Anderson.